**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CARLON M. COLKER, M.D., ET AL<br>Plaintiff<br><br>v.<br><br>ANN CALLIS, ET AL<br>Defendant | CASE #: 3:25-cv-00711<br><br><br>SEPTEMBER 11, 2026 |

**DEFENDANTS' BRIEF CONCERNING THE APPLICATION OF THE ATTORNEY-CLIENT PRIVILEGE AND WORK-PRODUCT DOCTRINE**

Pursuant to the order of this Court dated August 19, 2026, defendants Ann Callis and the Holland Law Firm, LLC hereby submit the following brief addressing the outstanding discovery issues as addresses at the discovery conference held between the parties on August 19, 2026, in front of the Honorable Robert Spector. Defendants have also submitted certain documents specifically identified by the plaintiffs to the Court for an in camera review as so ordered. As this court is aware, the primary issue before the Court is the applicability of both the attorney-client privilege and the work-product doctrine to discovery in this case. This pertains primarily to a series of documents which arising out of the defendant's role as counsel in two other litigations, one of which is presently pending in the United States District Court, District of Connecticut, and the other which was brought in the Superior Court of the State of Connecticut. The issue further extends to what, if any, extent the defendants can be compelled to provide answers either via deposition or through interrogatory responses which would force them to disclose information provided to them in confidence form their client under the assumed protection of the attorney-client privilege. Plaintiffs seek an improper window into both the unique and sacrosanct privilege

which exists between a client and her attorneys of record, as well as a view into the inner workings of their own opponent in an underlying litigation, as well as into the thoughts, litigation process, and strategy of the defendants in a highly contentious case which remains pending and ongoing in this very Court. For the reasons addressed below, their efforts should not be rewarded.

## I. **BACKGROUND**

The instant defamation action arises out of a previously existing legal claim filed against plaintiff Carlon Colker, M.D. by non-party Janel Grant. Grant, by and through the defendants acting as her counsel (among other local co-counsel), filed a bill of discovery action on July 16, 2024. *Janel Grant v. Carlon M. Colker, et al.*, FST-CV24-6068091-S, Doc No. 100.31 ("Grant Bill of Discovery");(*See also* Compl. ¶ 48). The allegations of the Grant Bill of Discovery largely track the alleged defamatory statements in this case. That Bill alleges that WWE founder Vince McMahon arranged for and directed Grant to receive treatment with Dr. Colker from November 22, 2019 through April 15, 2022. (Grant Bill of Discovery, ¶¶ 11-12.)[1] It further alleges that Dr. Colker prescribed Grant with "'adrenal trays' or 'adrenal supplement trays,' provided by his office and instructed her to take the unmarked pills daily [and] Dr. Colker did not explain the substances, dosages, or purpose of the pills to Grant beyond purportedly addressing her symptoms of fatigue." (*Id.* ¶13). Further, it alleges that Dr. Colker provided weekly IV infusions to Grant, the contents of which were not disclosed to Grant and that these treatments caused Grant to feel unwell. *Id.* ¶ 14.

However, prior to the Bill of Discovery action being filed, Grant was represented by the defendants (among other co-counsel) in the matter of of *Janel Grant v. World Wrestling*

[1] *Available at* https://efile.eservices.jud.ct.gov/DocumentInquiry/DocumentInquiry.aspx?crn=4957828&DocumentNo=27912253

*Entertainment, Inc.*, *et al*., 3:24-cv-00090 (the "WWE Lawsuit"). In a Complaint filed in the District Court of Connecticut on or about January 2, 2024, Grant alleges that she is a former employee of World Wrestling Entertainment, Inc. ("WWE") and that she was a victim of abuse, sexual assault and trafficking at WWE. The defendants have represented Grant in the WWE Lawsuit since its inception, and indeed, for months prior to the actual filing of that case. In that action, Grant alleges numerous abusive acts and actions that she was purportedly subjected to over a number of years—both by various WWE employees, including, but not limited to, WWE founder and executive Vince McMahon, as well as various people associated or connected with the WWE. *See Grant v. World Wrestling Entertainment, et al.*, 24-CV-00090, Amended Complaint, Doc. No. 117.

The WWE Litigation is, and was, decidedly high-profile, resulting in extensive media coverage and widespread public interest. Recognizing this, and further recognizing the considerations that would arise from the publicity that the WWE Litigation would generate, counsel for Grant engaged two separate public relations firms to assist with its litigation strategy to mitigate their own lack of experience in dealing with such publicity. The first such firm which was retained was The Agency Group ("TAG"), which was retained by way of an agreement signed on or about November 15, 2023. (See TAG Agreement, Ex. A.) Counsel later retained the services of SKDK by way of an agreement executed on or about September 5, 2024. (See SKDK Agreement, Ex. B.)

Within the WWE Litigation, Grant alleges that McMahon began imposing control over her medical treatment. Germane to the case at bar, Grant alleges that McMahon ultimately "insisted" that Grant see a physician of McMahon's choosing, identified within the WWE Complaint as "Celebrity Doctor." (*Id.* ¶¶ 115-116). In this action, the Plaintiffs admit that the

references to "Celebrity Doctor" and "Alternative Clinic" in the WWE Complaint refer to Dr. Colker and Peak Wellness, respectively. (*See* Compl. ¶ 37).

Defendants, along with their respective co-counsel, continued to litigate both the WWE Litigation and the Bill of Discovery action concurrently, continuously, since the time each such matter was commenced. The intertwined nature of these two cases, and the fact that each involved similar allegations from the same underlying client, being represented by the same litigation team, necessarily created a universe where counsel from each case was collaborating for the purpose of representing the interests of the client whom they shared.

On October 15, 2024, Grant, through her attorneys, filed an Opposition to a Motion to Dismiss in the Bill of Discovery action. On that same date, public relations firm SKDK released a Press Release regarding a filing in the Bill of Discovery action; within this Press Release were several statements attributed to defendant Callis which plaintiffs now allege constitute defamation The Press Release clearly identified that the subject of the Press Release, as well as of the Press Conference that was to follow, was "a new legal filing in Connecticut state court against Dr. Carlon Colker", thus clearly referencing the Bill of Discovery action. Also that date, the Press Conference was held, in which defendant Callis made several other statements which plaintiffs now allege are defamatory in nature.

Through discovery, plaintiffs now seek to use the allegedly defamatory statements made by Callis either within the Press Release or within the Press Conference to obtain both confidential information communicated to defendants from their client Grant – within both the Bill of Discovery action *and* the WWE Litigation – as well as attorney work-product generated in furtherance of defendants' representation of Grant in both the WWE Litigation and the Bill of Discovery matter. The information they seek has not been reasonably limited to that simply surrounding the Press Release or Press Conference; particularly, given that the statements at

issue necessarily invoke disputes at issue in both the Bill of Discovery and the WWE Litigation (which remains pending and ongoing in this very Court), plaintiffs are seeking to force the disclosure of highly sensitive and extremely privileged material which could threaten to completely undermine both matters and severely prejudice Janel Grant.

Defendants provided a privilege log to the plaintiffs , and from that privilege log, plaintiffs provided the following list of documents they specifically wanted to evaluate further: 14 – 17, 19, 23 – 25, 39, 44 – 47, 56, 58, 67, 73, 76 - 78, 82, 90 – 106.[2] Below, defendants explore the attorney-client privilege and the work-product doctrine as it applies both to these specific requested documents (which have been submitted for in camera review) as well as how the attorney-client privilege applies generally to any statements communicated to the defendants by their client Grant during their representation of Grant in both the WWE Litigation and the Bill of Discovery action.

## II. LEGAL STANDARD

"'The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice.' *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011). The purpose of the privilege 'is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration

[2] Plaintiffs specifically identified these documents by way of an email dated September 1, 2026. On September 3, 2026, defendants sent a return email seeking clarification as to whether this list of documents identified by the plaintiffs encompassed all of the documents at issue, but no response was received. As it was necessary for the defendants to brief this issue with respect to each specific document the plaintiffs seek to compel the defendants to produce, defendants would urge that this court not consider any documents sought by the plaintiffs outside the range provided to date, as defendants have not been provided the opportunity to address any such documents herein.

of justice.' *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981)".*Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg*, 171 F. Supp. 3d 136, 140 (S.D.N.Y. 2016)

The privilege also extends to protect communications from the attorney to the client. See, e.g., *United States v. Neal*, 27 F.3d 1035, 1048 (5th Cir. 1994) (privilege "'shields communications from the lawyer to the client only to the extent that these are based on, or may disclose, confidential information provided by the client or contain advice or opinions of the attorney.'") (citing *Wells v. Rushing*, 755 F.2d 376, 379 n.2 (5th Cir. 1985); *Thurmond v. Compaq Computer Corp.*, 198 F.R.D. 475, 480-82 (E.D. Tex. 2000) (cataloging cases applying privilege to communications from lawyer to client and noting divergence among federal courts concerning scope of such privilege); *Fed. Election Comm'n v. Christian Coalition*, 178 F.R.D. 61, 66 (E.D. Va. 1998) ("The attorney-client privilege . . . extends 'to protect communications by the lawyer to his client . . . if those communications reveal confidential client communications.'") (citing *United States v. Under Seal)*, 748 F.2d 871, 874 (4th Cir. 1984)); *Harmony Gold U.S.A., Inc. v. FASA Corp.*, 169 F.R.D. 113, 115 (N.D. Ill. 1996) (stating that privilege applies to communications from a lawyer to a client provided "the legal advice given to the client, or sought by the client, [is] the predominant element in the communication"); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 441-42 (S.D.N.Y. 1995) ("It is now well established that the privilege attaches . . . to advice rendered by the attorney to the client, at least to the extent that such advice may reflect confidential information conveyed by the client.") "[The] privilege protects communications between a client and an attorney, not communications that prove important to an attorney's legal advice to a client. Thus, a communication between an attorney and client may be privileged even if it turns out to be unimportant to the legal services provided." *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999)

"'The work-product rule shields from disclosure materials prepared 'in anticipation of litigation' by a party, or the party's representative, absent a showing of substantial need.' *Adlman*, 68 F.3d at 1501 (quoting Fed. R. Civ. P. 26(b)(3)). 'The purpose of the doctrine is to establish a zone of privacy for strategic litigation planning and to prevent one party from piggybacking on the adversary's preparation.' *Id.* (citing *United States v. Nobles*, 422 U.S. 225, 238, 95 S. Ct. 2160, 45 L. Ed. 2d 141 (1975)). The doctrine is 'distinct from and broader than the attorney-client privilege.' *Nobles,* 422 U.S. at 238 n.11. A document falls within the scope of the work-product privilege where it was 'created because of anticipated litigation, and would not have been prepared in substantially similar form but for the prospect of that litigation.' *Haugh*, 2003 U.S. Dist. LEXIS 14586, 2003 WL 21998674, at *4 (quoting *United States v. Adlman*, 134 F.3d 1194, 1195 (2d Cir. 1998))." *Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg*, 171 F. Supp. 3d 136, 141-42 (S.D.N.Y. 2016) "The work product doctrine protects materials prepared not only by attorneys but also by their agents. *Costabile v. Westchester, N.Y.*, 254 F.R.D. 160, 164 (S.D.N.Y. 2008)" *Universal Standard Inc. v. Target Corp.*, 331 F.R.D. 80, 92-93 (S.D.N.Y. 2019)

"There are two types of work product, ordinary or fact . . . and opinion." *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir. 2005). "[F]act work product may encompass factual material, including the result of a factual investigation." *Id.* (citing *In re Grand Jury Subpoena Dated Oct. 22, 2001*, 282 F.3d 156, 161 (2d Cir. 2002)). "In contrast, opinion work product reveals the 'mental impressions, conclusions, opinions, or legal theories of an attorney or other representative[.]'" *Id.* (quoting *Adlman II*, 134 F.3d at 1197). Opinion work product is entitled to greater protection than fact work product. *See* Fed. R. Civ. P. 26(b)(3)(B); *Adlman II*, 134 F.3d at 1197. "[W]hereas fact work product is subject to disclosure once plaintiff has demonstrated substantial need," opinion work product "is entitled to the highest protection afforded by law, which requires at a minimum a highly persuasive showing of need for

disclosure." *Dixon v. City of Buffalo*, No. 1:19-cv-1678 (WMS) (JJM), 2023 U.S. Dist. LEXIS 238711, 2023 WL 11819596, at *2 (W.D.N.Y. Jan. 19, 2023) (quotation marks, citations and ellipsis omitted). Courts regularly describe the protection afforded to opinion work product as "virtually absolute." *E.g., id.; see also Noel v. City of New York*, No. 15-cv-5236 (LTS) (KHP), 2018 U.S. Dist. LEXIS 213425, 2018 WL 6649969, at *3 (S.D.N.Y. Dec. 18, 2018)." *FTC v. Chase Nissan, LLC*, No. 3:24-cv-00012 (JCH), 2024 U.S. Dist. LEXIS 133819, at *7-8 (D. Conn. July 29, 2024)

## III. ARGUMENT

The information sought by the plaintiffs can be broken down into two distinct categories; first, communications (and associated or attached documents) between Janel Grant and her attorneys, including defendants Callis and other members of the Holland Law firm, as well as those from other firms who represent Grant in connection with either the WWE Litigation or with respect to the Bill of Discovery matter; and second, communications (and associated or attached documents) between defendant Callis and other members of the litigation team.[3] Plaintiffs seek the disclosure of these communications as well as certain associated documents which may be attached to those communications, and in so doing, attempt to override or sidestep the protections of both the attorney-client privilege and the work-product doctrine which should rightfully serve to prevent the disclosure of these documents.

[3] The full list of persons who appear within these communications, and their affiliations/roles, is as follows: Janel Grant – Client; Ann Callis, Greg Jones, Eric Holland – Attorneys for Janel Grant, Holland Law; Diana Williams, Tanya Heepke, Susan Jones, Erika Stassi – Support Staff, Holland Law; Charles Munn, Jaclyn Hall, Ziggy Andrijuaskaite, Mrk Grider, Aaron Lang – Attorneys for Janel Grant, Nelson Mullins, LLP; David Slossberg, Erica Nolan – Attorneys for Janel Grant, Hurwitz Sagarin & Slossberg, LLC; Carolina Hurley, Katie Case, Breanna Butler Koslow, Derva McNiece – PR Consultants, The Agency Group; Kendra Barkoff, Jennifer Lee, Jade Klain, Molly Salter, Kevin Gerson – PR Consultants, SKDK.

One notable difference between the instant case before this court and essentially every other case on record addressing similar issues of the attorney-client privilege or the work-product doctrine is that the protections now invoked do not pertain to the instant litigation. That is, defendants Callis and Holland Law are do not seek to shield their own communications to defense counsel, nor is undersigned counsel looking to protect its own work-product generated in anticipation of or in connection with this litigation. Rather, the documents, information and communication at issue predate – in many cases, by several years – both this matter as well as the Bill of Discovery action which ultimately gave rise to the Press Release and Press Conference which contain the alleged defamatory statements. Plaintiffs therefore do not seek to intrude merely on the protections afforded to the defendants, but rather protections afforded to non-parties to this case, persons who have ongoing interests in other litigated matters who would suffer tremendous harm and prejudice in those matters should plaintiffs prevail.

**A. <u>Statement of Argument / Nature of the Attorney-Client Privilege</u>**

As a threshold issue, defendants are somewhat at a disadvantage given the nature of the simultaneous briefing schedule, in that it is plaintiffs who will be seeking to petition this court to compel the defendants to produce certain documents or information over and above the privilege assertions lodged by the defendants, yet defendants must brief those issues before being placed on notice of what, exactly, plaintiffs are seeking so as to properly respond. As noted above, defendants are aware, by way of an email dated September 1, 2026, of forty (40) documents which plaintiffs identified on the privilege log provided by the defendants as items they wished to examine. However, other than those specific documents, defendants are forced to play a game of "blind man's bluff" with respect to any discovery arguments plaintiffs might raise. To that end, defendants will likely be forced to reserve significant portions of any such argument for the upcoming reply briefing. However, defendants are aware – generally – that plaintiffs will attempt

to argue that defendant Callis should be required to disclose sensitive and confidential information communicated to her by her client Janel Grant, either in responding to certain interrogatories, or by way of her own deposition testimony. Defendant can therefore argue otherwise; that is, that the attorney-client privilege is held by the client, and that Callis cannot be compelled to disclose what was communicated to her in confidence by her client where she does not hold the privilege nor holds the ability to waive that privilege.

"The rule which places the seal of secrecy upon communications between client and attorney is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure. But the privilege is that of the client alone." *Hunt v. Blackburn*, 128 U.S. 464, 470, 9 S. Ct. 125, 127 (1888)

"The privilege, indeed, is not that of the attorney, but of the client; and it is indispensable for the purposes of private justice. Whatever facts, therefore, are communicated by a client to counsel, solely on account of that relation, such counsel are not at liberty, even if they wish, to disclose; and the law holds their testimony incompetent." *Chirac v. Reinicker*, 24 U.S. (11 Wheat.) 280, 294 (1826)

First, it is axiomatic, and well-established at common law as well as by the historic rulings of our Supreme Court, *supra* that the attorney-client privilege is held by the client, and that therefore the client is the only one who may waive it. See, e.g. *In re Lindsey*, 158 F.3d 1263 (D.C. Cir. 1998) Further, it is a basic and well-understood concept that every attorney has an ethical obligation to maintain the attorney-client privilege in confidence. American Bar Association Model Rule 1.6 holds that "a lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry our the representation of the disclosure is permitted by paragraph (b)."

It is clear that the plaintiffs in this case seek to force defendant Callis to provide responses to discovery; both in terms of the documents addressed below, as well as potential interrogatory responses and future deposition testimony, which would require her to both disclose information communicated to her by her client under the protection of the attorney-client privilege. Communications by Grant to her counsel conveying information which remained only between counsel (or other similarly privileged persons) is absolutely privileged. A privilege which Callis does not hold, and therefore cannot waive, and which Callis has an ethical obligation as an attorney to uphold. To the extent that plaintiffs seek to force any such disclosures, this Court should overrule any such efforts and instead uphold the longstanding tradition of attorney-client privilege and confidentiality as expressed by our Supreme Court more than 200 years ago.

**B. <u>Communications Between Janel Grant and Her Attorneys – Attorney-Client Privilege (Items 19, 23-25)</u>**

Some of the communications and documents requested by the plaintiffs reflect the transmission of confidential information solely between Janel Grant and her attorneys, made within the confines of defendants' representation of Grant during multiple litigated matters. For example, Item 19 is an email from Grant to her attorneys containing both protected health information and communications by Grant which were relevant to her attorneys' pursuit of both the WWE Litigation and Bill of Discovery, and the advice rendered in connection with those matters. Similarly, items 23, 24 and 25 are emails from Grant which forward marketing emails from plaintiff Peak Wellness while also containing certain impressions and opinions of Grant related to those emails, all of which was done for the purpose of informing the nascent Bill of Discovery action. These documents exist purely as communications between a client and her counsel of record for the purpose of seeking legal advice and furthering the litigation already existing or in the process of being commenced. There is no reasonable dispute that the

communications made by Grant within these emails are privileged, were made for the purpose of seeking legal advice or furthering the legal actions already pending, and not subject to disclosure.

### C. Communications Between Janel Grant, Her Attorneys and Retained Consultants – Attorney-Client Privilege and Work-Product Doctrine (Items 14-17)

Plaintiffs also seek the production of Items 14-17, which are communications between Grant, Callis, co-counsel Charles Munn of Nelson Mullins LLP, as well as public relations consultants retained as part of the litigation team. The consultants in question in these emails are Carolina Hurley, Katie Case, Breanna Butler Koslow and Derva McNiece of The Agency Group ("TAG"). Plaintiffs will undoubtedly argue that the inclusion of these consultants within these communications waives the attorney-client privilege. However, our courts have held that the attorney-client privilege can extend beyond the sphere of just the attorney and the client to other third-parties, and thus those protections should still persevere.

In the matter of *Viacom, Inc. v. Sumitomo Corp. (In re Copper Mkt. Antitrust Litig.)*, 200 F.R.D. 213 (S.D.N.Y. 2001), the Southern District of New York held that the attorney-client privilege served to protect documents and communications which were shared with a public relations firm retained to assist the client and attorneys in dealing with the realities of a high-profile litigation. "Consistent with Supreme Court Standard 503, courts have held that the attorney-client privilege protects communications between lawyers and agents of a client where such communications are for the purpose of rendering legal advice. *Upjohn Co. v. United States*, 449 U.S. 383, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981); *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989), *cert. denied*, 502 U.S. 810, 116 L. Ed. 2d 31, 112 S. Ct. 55 (1991) (attorney-client privilege protects communications made to agents assisting client); *CSC Recovery Corp. v. Daido Steel Co., Ltd.*, 1997 U.S. Dist. LEXIS 16346, No. 94 Civ. 9214, 1997 WL 661122 at *3 (S.D.N.Y. Oct. 22, 1997) (attorney-client privilege protects communications between clients and attorneys

and agents of both); *H.W. Carter & Sons, Inc. v. William Carter Co.*, 1995 U.S. Dist. LEXIS 6578, No. 95 Civ. 1274, 1995 WL 301351 at *3 (S.D.N.Y. May 16, 1995) (communications by public relations consultants who assisted attorneys in rendering legal advice protected by the attorney-client privilege)." *Viacom, Inc. v. Sumitomo Corp. (In re Copper Mkt. Antitrust Litig.),* 200 F.R.D. 213, 217 (S.D.N.Y. 2001)

Notably, the *Viacom* court addressed how the public-relations firm in that matter was incorporated to perform a function which was "necessary" in the context of the litigation due to press scrutiny and the public relations considerations which could arise, the need for public statements about the litigation and the potential "legal ramifications" of such statements. Further, the *Viacom* court, relying on *Upjohn Co. v. United States*, supra, held that an "independent contractor status provides no basis for excluding [PR firm] communications with . . . from the protection of the attorney-client privilege." *Viacom, Inc. v. Sumitomo Corp. (In re Copper Mkt. Antitrust Litig.)*, 200 F.R.D. 213, 219 (S.D.N.Y. 2001)

The communications between Grant and her attorneys which also include consultants from TAG clearly qualify as protected under such an analysis. It is undisputed that the WWE Litigation resulted in significant media coverage, and the documents in question (Items 14-17) clearly set forth a series of communications which both include confidential information disclosed by Grant pertaining to her claims in the WWE Litigation as well as the then-pending Bill of Discovery, as well as communications from the consultants which establishes a strategy for managing public relations in light of the litigation, similar to *Viacom*. This establishes that the disclosures made by Grant within these emails should rightly fall under the attorney-client privilege.

However, to the extent that the court determines otherwise, defendants would argue that only a small portion of these documents are relevant to the case at bar; specifically, the only mention of the plaintiff comes in one paragraph of Item 14. Defendants would alternatively argue

that, if the court determines these items are not protected by the attorney-client privilege or the work-product doctrine[4], that a proportional solution would be to only disclose Item 14, properly redacted so as to only disclose the information which may be potentially relevant to this matter.

### D. Documents and Communications Between Defendants and Co-Counsel Attorneys For Janel Grant – Attorney-Client Privilege and Work-Product Doctrine (Items 44, 47, 56, 58, 67, 73, 77, 80, 82, 92, 94, 96, 98, 99, 105)

Next, plaintiffs also seek the disclosure of a series of communications between the attorneys jointly involved in representing Janel Grant, all of which involve the discussion of strategy, or the transmission of draft documents or otherwise privileged material such as client records, including medical records to which plaintiffs would not ordinarily have a right. All of these documents and communications plainly fall within the protection of the work-product doctrine; each such document exists solely as a result of the either pending or ongoing litigation, be it the WWE Litigation or the Bill of Discovery action. Each document and communication is clearly something created for the purpose of that litigation and not a record kept in the ordinary course of business. Moreover, all of these documents and communications contain highly sensitive discussion regarding strategy, attorney opinion, and discussion regarding both litigated matters. Additionally, many of the communications at issue also fall under the protections of the attorney-client privilege, as they contain information disclosed by Grant to her attorneys being discussed by those attorneys, or contained in a document provided to her attorneys. Defendants would also object, generally, to the full production of these documents in an unredacted form as, to the extent any of these documents have any relevance to the claims at issue (which defendants do not concede), significant portions of these documents have nothing to do with the defamation claims

[4] Defendants argue that these documents are protected under the work-product doctrine as well; however, rather than argue that doctrine here, defendants will instead refer to and direct the court to the larger argument regarding that issue, which appears below.

made by plaintiffs. If this court does hold that any of these documents should be produced, defendants would argue that those documents should be redacted so as to only provide any portions which may refer to the plaintiffs or pertain to the allegations of the Complaint.

Item 44 is an email from co-counsel Charles Munn in the WWE Litigation to both Grant and defendant Callis, containing a selection of material culled for presentation to the client and the attorneys as it pertains to the ongoing WWE Litigation. The purpose of such an effort is obvious in consideration of the media attention requiring the consideration of the public relations aspect of the litigation as discussed above.

Item 47 is a comprehensive litigation planning document, forwarded from defendant Callis to her administrative assistant Diana Williams. It outlines a plan the WWE Litigation and contains sensitive information protected by both the attorney-client privilege (as it includes extensive detail regarding disclosures made by Grant to her attorneys for purposes of informing the WWE Litigation) as well as being the absolute epitome of opinion "work-product" in that it specifically outlines the plans, mental impressions, conclusions and legal theories of Grant's counsel as of December 4, 2023, in both the short and long-term.

Many of the documents in question are brief; Item 56 is an email discussion between defendant Callis and her paralegal containing a draft of a letter and defendant's thoughts regarding certain statutes informing legal strategy in the Bill of Discovery action. Item 67 is an email from Callis to her co-counsel advising of a development in the efforts that preceded the Bill of Discovery litigation. Item 73 is an email exchange between counsel support staff in which they discuss proposed strategy and edits with respect to the proposed Bill of Discovery complaint.

Item 77 is an email from Atty. Callis to herself forwarding her own client's medical records for her personal review. Item 80 is an email exchange between Callis and Holland Law staff member

Erika Stassi discussing potential expert witness needs in the "WWE case."[5] Item 82 is an email from Callis to her co-counsel in which she attaches a court filing and offers her opinion as to the same. Item 92 is an email from a Holland attorney to defendant Callis and other co-counsel attaching documents for review and discussing the method by which they would be reviewed.

Item 94 is an email from Holland Law attorney Jones to Holland support staff which contains highly sensitive information relating to an unrelated person whom defendants were investigating in connection with the WWE Litigation. Plaintiff Colker is only mentioned briefly in a manner completely unrelated to any of the allegations of the Complaint or in any way connected to the Press Release or Press Conference, or even the Bill of Discovery, generally. This document pertains entirely to the WWE Litigation and clearly represents work-product generated in connection with that litigation. Item 96 is an email from co-counsel Charles Munn to defendant Callis and multiple other attorneys representing Grant, discussing the strategy behind the "filing plan" for the opposition to the motion to dismiss in the Bill of Discovery action. This email represents work-product in that it clearly shows litigation strategy, opinion and decision making. Item 98 is an email from co-counsel in the Bill of Discovery action to defendant Callis, attaching a selection of medical records along with that attorney's thoughts and opinions about those medical records and what they mean with respect to the pending case between the parties. This is clear opinion-based work product, and has no basis for production. Item 99 is merely defendant Callis' response to that same email. Finally, Item 105 is an email marked "ATTYS ONLY" and reflects a discussion between Charles Munn and co-counsel Hall, Nolan, Callis, Andrijauskaite, Jones, and

[5] Please note that there was a typographical error in the privilege log which erroneously stated that a "consultant" was included on Items 73 and 80. This was in error; each person included on these communications was either an attorney or a staff member for those attorneys.

Slossberg regarding suggested changes and edits to the opposition brief in the Bill of Discovery action.

All of the documents listed above are properly protected by the work-product doctrine. (At least several would also qualify for protection under the attorney-client privilege.) All of these documents and communications were shared only with either various co-counsel and support staff, and plainly demonstrate attorney work-product generated either in preparation for, or during and in connection with, ongoing litigation. To say nothing of the fact that defendants do not concede that any of these documents are relevant, either entirely or in part, to the claims made by the plaintiffs, there is no "substantial need" that plaintiffs can demonstrate with respect to these documents, nor the information contained within, which would serve to override the protections of the work-product doctrine.

**E. Documents and Communications Between Defendants, Co-Counsel Attorneys for Janel Grant and Consultants – Attorney-Client Privilege and Work-Product Doctrine (Items 58, 76, 78, 90, 91, 93, 95, 100-104, 106)**

Finally, a significant portion of the documents sought by the plaintiffs include communications and attached documents between defendants, their various co-counsel in both the WWE Litigation and the Bill of Discovery action, as well as the public relations litigation consultants from both TAG and SKDK. It is expected that plaintiffs will argue that the inclusion of the consultants within these communications, or the sharing of documents with those consultants voids the protections of the work-product doctrine. To the contrary, there is significant amount of legal precedent which expands the broad protection of the work-product doctrine to public relations consultants, and as such, the documents at issue should be preserved from disclosure here.

"A lawyer or client may share a privileged communication with a media or public relations expert without waiving the privilege if the attorneys are 'using the public relations consultant to

implement a specific legal strategy that require[s] the use of a public relations consultant.' *Universal Standard*, 331 F.R.D. at 92 (citation omitted); *see In re Grand Jury Subpoenas Dated Mar. 24, 2003*, 265 F. Supp. 2d 321, 329 (S.D.N.Y. 2003)" *Lively v. Wayfarer Studios LLC*, No. 24-cv-10049 (LJL), 2025 U.S. Dist. LEXIS 175127, at *20 (S.D.N.Y. Sep. 9, 2025) "[An] otherwise valid assertion of work-product protection is [not] waived with respect to an attorney's own work-product simply because the attorney provides the work-product to a public relations consultant whom he has hired and who maintains the attorney's work-product in confidence. *See, e.g., In re Pfizer Inc. Secs. Litig.*, 1993 U.S. Dist. LEXIS 18215, 1993 WL 561125, *6 (S.D.N.Y. Dec. 23, 1993); *Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp.*, 125 F.R.D. 578, 589 (N.D.N.Y. 1989). This is especially so if, as plaintiffs here assert, the public relations firm needs to know the attorney's strategy in order to advise as to public relations, and the public relations impact bears, in turn, on the attorney's own strategizing as to whether or not to take a contemplated step in the litigation itself and, if so, in what form." *Calvin Klein Trademark Tr. v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000)

This Court's in camera review of the documents at issue should ultimately result in a determination that the relationship between the public relations consultants and the attorneys was synergistic; that is, as stated by the *Klein* court, the public relations consultants needed to know the litigation strategy in order to properly advise as to public relations, and meanwhile, the public relations itself had a bearing on the "contemplated steps" in both the WWE Litigation and the Bill of Discovery. Further, the language of the agreements with both TAG and SKDK are informative. The TAG Agreement states that it was retained to "assist with mutually agreed strategic communication services, including but not limited to crisis management and litigation support, in connection with Janel Grant and the Claim . . . . an action against WWE, Vince McMahon and/or John Laurinitis." See Ex. A.

The SKDK Agreement is even more explicit in detailing the intertwining of the public relations and litigation spheres. That document reads that "SKDK agrees to provide consultation and public relations services in connection and in furtherance of the legal services Nelson Mullins and HLF are providing to Client . . . . The work undertaken by SKDK in connection with the engagement is being done for and under the direction of Nelson Mullins and HLF and, accordingly, is considered attorney work product and/or covered by the attorney-client privilege. All communications, correspondence, instruments, and writings between and among Nelson Mullins, HLF, Client and SKDK shall constitute attorney work product and/or attorney-client privileged materials." This agreement directly contemplates the scope of the work to be done by SKDK and folds them into the litigation team with directive to include them within all applicable privileges. Based on this language, it is abundantly clear that the public relations consultants were hired not merely for an independent public relations campaign, but instead as a integrated part of a wider litigation group to help implement a specific litigation strategy. This can be clearly seen when turning to the actual documents in dispute:

Item 58 is an email exchange between defendant Callis and litigation consultant Carolina Hurley, including co-counsel Charles Munn, in which Callis outlines her opinions as to recent conduct of plaintiff Colker in regards to his actions prior to the filing of the Bill of Discovery, as it informs and precedes the Bill of Discovery and the decisions made by counsel to pursue it.

Item 76 is an email exchange between defendant Callis, Munn, Hurley and McNeice regarding a press inquiry over a filing in the Bill of Discovery matter. This inquiry is unrelated to the Press Release or the Press Conference, as is predates either by three months, and does not reference in any way the statements, or the subject matter of those statements. Item 78 is similarly a forwarded email from Callis to those same recipients containing a press inquiry "Seeking

comment on your filing in Vince McMahon case" which again is completely unrelated to the Press Release or Press Conference.

Item 90 is an email exchange between Callis, attorney Greg Jones of Holland Law, as well as attorneys Munn, Hall, Lang and Andrijauskaite of Nelson Mullins, discussing and addressing changes and suggestions as to a proposed case "timeline" or "explainer." Within this email is a nested email from Jennifer Lee of SKDK asking for a copy of the "timeline." This document contains attorney opinion and strategy mixed with consultation. Item 91 is an email marked "PRIVILEGED AND CONFIDENTIAL" from Jade Klain of SKDK to defendant Callis and co-counsel Munn. It attaches a work-product from SKDK reflecting the "case and communications plan" which reflects the interplay between the public relations and litigation strategies as contemplated by the *Klein* court.

Item 93 is an email from Jennifer Lee of SKDK, marked "PRIVILEGED AND CONFIDENTIAL" which attaches work-product in the form of "prep docs" for a briefing and press call with respect to the WWE Litigation. These documents are clearly unrelated to either the Press Release or Press Conference, and are instead work-product generated in connection with the WWE Litigation. Item 95 is an email from consultant Jennifer Lee of SKDK to Callis as well as to Molly Salter and Jade Klain, both of SKDK, containing work-product in the form of a "NewsNation Briefing Memo" for a press appearance defendant Callis was making with respect to the WWE Litigation. It contains sensitive work-product reflecting opinion, strategy and thought process related to that litigation and has no relation to the claims at issue in the instant matter.

Item 97 is an email from Kendra Barkoff of SKDK which itself contains a nested email exchange between attorneys Callis and Jones of Holland Law and Munn and Hall of Nelson Mullins, discussing the draft motion in opposition to a motion to dismiss filed by Dr. Colker in the Bill of Discovery action. This email contains work-product where both the attorneys as well as

the consultants review, discuss, and offer opinion as to the content of the draft and suggestions as to the direction of the litigation.

Item 100 is an email from defendant Callis which contains a nested email conversation surrounding the "Medical Records Notes" previously addressed above with respect to Items 98 and 99. Item 100 merely folds consultant Kendra Barkoff of SKDK into the same discussion, and the resultant work-product includes opinion and mental impression as to the contents of certain records, as well as suggestions as how to integrate the same into future filings. The entire purpose of all of the discussion is unmistakably tied to legal advice, and discusses attorney opinion and strategy both in terms of the ongoing Bill of Discovery action as well as how that action might inform any public relations and vice versa. Item 101 is another email from Callis to co-counsel Erica Nolan, David Slossberg, Charles Munn, and Barkoff, Klain, and Kevin Gerson of SKDK, containing a nested email discussion regarding the "filing plan" for the motion in opposition in the Bill of Discovery action. This entire exchange represents work-product on the part of the entire litigation team discussing their opinion, mental impressions and conclusions concerning not just the motion itself, but the strategy behind it. Once again, this is clearly a document which falls within the protections of the work-product doctrine. Item 102 is an email from co-counsel Erica Nolan to the same group of recipients, continuing the discussion and circulating a draft motion for review. Importantly, all of these emails also should be protected pursuant to the attorney-client privilege, as they contain discussion between co-counsel and other protected parties concerning confidential conversations held with the client, which would otherwise be protected from disclosure. Item 103 is an email from Greg Jones of Holland Law to Munn, Hall and Andrijauskiate which in and of itself is unremarkable, but which also contains as a nested conversation the same exchange as reflected in Item 100, above.

Item 104 is an email from Holland Law attorney Jones to co-counsel Erica Nolan, Callis, Charles Munn, Hall, Barkoff, and Holland Law staff member Susan Jones, containing a nested email chain in which the litigation team discusses work-product from Barkoff concerning the Bill of Discovery action, in which multiple attorneys provide their mental impressions or opinions for use in formulating that work-product.

Finally, Item 106 is an email from Jade Klain of SKDK to Callis and Jones of Holland Law, Munn and Hall of Nelson Mullins, Nolan and Slossberg of Hurwitz Sagarin, and Barkoff and Gerson of SKDK. Nested within this email is a discussion among the recipients regarding the "filing plan" for the motion in opposition filed in the Bill of Discovery action; this discussion contains a wide-ranging discussion of mental impression, opinion, and conclusions from various members of the Grant litigation team. Discussion includes the draft opposition, the timing of the same, and the consideration of the filing to the public relations aspect of the case, and vice versa. Attached to this email are two other pieces of work-product authored by the SKDK consultants.

Ultimately, all of the documents included herein are clearly work-product, authored within the confines of either the WWE Litigation and/or the Bill of Discovery action, and exist solely within the litigation team: the attorneys representing Janel Grant and the consultants who were explicitly folded in to that group. These documents were not authored within the normal course of business, but were generated specifically for use within the respective litigations. They are, at their core, the epitome of work-product. As addressed above, our courts have expanded those protections to public relations consultants when they fill a role similar to that held by TAG and SKDK. Defendants would request that this Court do the same.

## IV. <u>CONCLUSION</u>

Defendants anticipate augmenting the arguments herein upon reply, based upon whatever specific issues are raised by the plaintiff with respect to the documents they seek and/or the type

of information they argue they are entitled to receive from the defendants. However, defendants resolutely argue that the discovery sought by the plaintiffs in the instant case is nearly entirely protected by both the attorney-client privilege and the work-product doctrine. Moreover, the nature of the discovery requests, in that they seek to reach into and explore two other litigated matters in which defendants serve as counsel, both of which where defendants represent a client who is not a party to the present action, represent a unique threat to persons unconnected to this case and who have their own interests in justice which should not be intruded upon nor abrogated. Indeed, should plaintiffs be allowed to probe into the inner workings of two other litigated matters – one of which remains open and pending in this very Court – the effects could be disastrous and prejudicial and antithetical to the very precepts behind our system of law.

Defendants would urge this Court to hold that the documents withheld are properly protected from disclosure by the privileges as asserted. However, as argued within, if this Court holds otherwise, defendants would argue in the alternative that many of the documents, if not all, contain a commingled mix of information and disclosures which are often irrelevant to the claims made by the plaintiffs in the instant case. (Defendants have not conceded relevance as to any of the documents herein.) To that extent, if this Court does require the disclosure of certain documents, defendants would request that those documents be properly redacted so as to exclude any sensitive, irrelevant information which does not pertain directly to the claims made by the plaintiffs within the Complaint. However, as stated elsewhere, defendants' ultimate position is that the proper and just decision is to protect these documents from disclosure entirely, given the overwhelming legal and factual basis for doing so.

Respectfully submitted,
ANN CALLIS
HOLLAND LAW FIRM LLC

By: *<u>/s/ Timothy Gondek / Juris #ct29190</u>*

Timothy Gondek
Hannah Meyers
LEWIS BRISBOIS BISGAARD & SMITH, LLP
185 Asylum Street
Suite 2603
Hartford, Connecticut 06103
Timothy.Gondek@LewisBrisbois.com
Hannah.Meyers@LewisBrisbois.com
hartfordeservice@lewisbrisbois.com
Tel: (860) 748-4806
Fax: (860) 748-4857

**CERTIFICATE OF SERVICE**

This is to certify that on September 11, 2025, a copy of the foregoing was filed electronically on the Court's CM/ECF system. Notice of this filing will be sent to all counsel of record for viewing via the Court's ECF system.

*/s/ Timothy Gondek*
Timothy Gondek

# Exhibit A

**LETTER OF AGREEMENT**

November 15, 2023

Brown Rudnick, LLP
7 Times Square
New York, NY 10036

Holland Law Firm LLC
211 North Broadway, Suite 2625
St. Louis, MO 63102

Dear Brown Rudnick LLP and Holland Law Firm LLC,

This constitutes the master services agreement ("Agreement") between **Brown Rudnick, LLP and Holland Law Firm LLC** (individually and collectively, jointly and severally "Client"), on the one hand and The Agency PR Group LLC ("Agency"), on the other hand, for the provision of services as set forth herein. The parties agree as follows:

**1. Services.** Client is retaining Agency as its exclusive public relations counsel to assist with mutually agreed strategic communication services, including but not limited to crisis management and litigation support, in connection Janel Grant and the Claim ("Services"). Janel Grant will be commencing an action against WWE, Vince McMahon and/or John Laurinaitis (the "Claim"). If Client wants to expand the scope of the Services or wants additional services, Client and Agency shall mutually agree upon the additional services to be performed and the amount required to perform the additional services and either amend the current Agreement or execute a new Agreement, as appropriate. Agency shall bill Client and Client shall pay Agency for such additional services in accordance with the terms of this Agreement.

**2. Compensation.**

**2.1. Fee.** As consideration for the Services, Client hereby agrees to pay Agency a sum of per month ("Services Fee"). The first month's Services Fee shall be due upon execution of the Agreement. Further, in the event of an award or settlement to Janel Grant in connection with the or more, during the term or within six (6) months of the termination or expiration of the term of this Agreement (the "Tail Date"), Client hereby agrees to pay Agency an additional sum of (the "Contingent Fee"). If as of the Tail Date settlement negotiations are taking place, then Agency's right to receive the Contingent Fee shall be extended for an additional six months. The Contingent Fee shall be due within ten (10) days of payment of the award or settlement.

**2.2. Expenses/Taxes.**

**(a) Third-Party Expenses, Travel and Additional Expenses.** Client shall reimburse Agency for all out-of-pocket, third-party vendor expenses incurred by Agency in performing the Services. Such expenses include, but are not limited to, research services, media monitoring/clipping, production costs, and conferencing charges. Client shall reimburse Agency monthly for all travel and/or entertainment related expenses incurred by Agency or its employees in performing the Services, including, but not limited to, air travel, ground transportation, lodging, meals, tips and wireless internet and long distance telephone calls, cellular phones, messengers, and overnight delivery, provided, however, that any individual expense over shall be subject to advance approval by the Clients

**(b) Taxes.** Agency may charge and invoice Client, and Client shall pay, any applicable transaction taxes, including, without limitation, sales, use, value added, general services, or any other similar transaction taxes imposed by any government or taxation authority, as a result of Agency's performance of the Services regardless of when payment for Services was made, unless Client provides Agency with a valid exemption certificate or other valid documentation that Agency is not required to collect such transaction taxes or Client can demonstrate that it has already paid such transaction taxes to the applicable government or taxation

authority. Within a reasonable timeframe set forth in writing, each party shall provide and make available to the other party any documentation related to applicable transaction taxes reasonably requested by the other party, including resale certificates, direct pay permits, or treaty certifications. Client shall not be responsible for any taxes based solely on Agency's income.

**2.3.** **Payment.** With respect to the Services Fee, Client will be billed monthly in advance and payment shall be due to Agency no later than fifteen (15) business days of Client's receipt thereof. With respect to Expenses, Client will be billed monthly, and payment shall be due to Agency no later than fifteen (15) business days of Client's receipt thereof. Client acknowledges and agrees that in the event that payments due to Agency hereunder are not received in accordance with this Agreement, Agency reserves the right and is entitled to suspend any services hereunder, including the Services, until such time as all outstanding payments are received by Agency only after providing Client with a mandatory two (2) days' notice to cure prior to taking effect. If payment is not received by Agency within thirty (30) days of the invoice date, Agency may assess and Client agrees to pay a late payment charge at the rate of 1% per month (12% per year) or the maximum legal rate. To the extent that Client disputes any invoice, Client must provide Agency written notice of such dispute within thirty (30) days of the invoice date, or Client shall waive any claim with respect to such invoice.

**3.** **Indemnification.**

**3.1** Client represents and warrants that the materials and information it provides to Agency are accurate and complete and that it is the owner or licensee of all intellectual property rights sufficient to enable Agency to edit, reproduce and otherwise use, publish and distribute such materials in performing Services for Client. Client shall defend, indemnify and hold Agency harmless from and against any third-party liabilities, actions, claims, damages, judgments or expenses, including reasonable attorneys' fees and costs, (collectively "Claims") that arise out of or relate to: (i) information, statements or materials prepared or provided by Client, that Client directed Agency to use or that were approved by Client (ii) product liability or death, personal injury or property damage arising out of, or relating to, Client's acts or omissions or Client's products, services or equipment; and/or (iii) Client's negligence or willful misconduct or breach of this Agreement.

**3.2** Agency shall defend, indemnify and hold Client harmless from and against any Claims that arise out of, or relate to Agency's gross negligence or willful misconduct in performing the Services under this Agreement. Agency shall not be liable for any delay in or omission of publication or transmission, or for any error in any press or other publication, to the extent that such delay, omission, or error is outside Agency's control or is the result of any third party's action or inaction.

**3.3** The indemnifying party's obligations under this Agreement are conditioned upon (i) the other party's giving prompt, written notice of a Claim; (ii) the indemnifying party having sole control of the defense and settlement of a Claim (provided that the indemnifying party may not settle any Claim in a manner that would adversely affect the other party's rights, reputation or interests without the other party's prior written consent, which shall not be unreasonably withheld); and (iii) the other party's cooperation with the indemnifying party, at the indemnifying party's expense, in the defense and settlement of the Claim, as the indemnifying party may reasonably request. The party seeking indemnification shall have the right to participate in the defense thereof with counsel of its choosing at its own expense.

**3.4** In addition, in matters in which Agency is not an adverse party, Client shall pay or reimburse Agency for all reasonable staff time, attorneys' fees and expenses Agency incurs in relation to subpoenas, depositions, discovery demands and other inquiries in connection with suits, proceedings, governmental, legislative or regulatory hearings, investigations or other civil or criminal proceedings in which Client is a party, subject or target.

**3.5** This Section shall survive termination or expiration of this Agreement.

**4.** **Term.** This Agreement shall commence effective as of November 15, 2023 and shall continue until February 15, 2024. Thereafter, the Agreement shall continue on a month to month basis until terminated by either party as provided herein.

**5.** **Termination**. After the initial three (3) month period, either party may terminate this Agreement for any reason by providing the other party with not less than thirty (30) days written notice. In addition, either

party may terminate this Agreement upon ten (10) days written notice to the other party in the event of a material breach of this Agreement (including non-payment of any invoice), if such breach is not corrected by the other party within the ten-day period. Either party may immediately terminate this Agreement if the other becomes insolvent; is unable to pay its debts as they mature; is the subject of a petition in bankruptcy or of any other proceeding under bankruptcy, insolvency or similar laws; makes an assignment for the benefit of creditors, or is named in, or its property is subjected to, a suit for the appointment of a receiver; or is dissolved or liquidated. The respective rights and duties of the parties shall continue in full force and effect during the notice period. Upon expiration or termination of this Agreement, Client shall pay Agency fees through the termination date and reimburse Agency for expenses incurred through the termination date. In addition, Client shall either assume liability or pay Agency for non-cancelable expenses committed to be incurred prior to the termination date. This Section shall survive termination or expiration of this Agreement.

**6.** **Limitation of Liability.** AGENCY'S AGGREGATE LIABILITY ARISING OUT OF, OR RELATING TO, THIS AGREEMENT (WHETHER IN CONTRACT, TORT OR OTHER LEGAL THEORY) SHALL NOT EXCEED THE AMOUNT OF FEES PAID BY CLIENT TO AGENCY PURSUANT TO THIS AGREEMENT. IN NO EVENT SHALL AGENCY BE LIABLE TO CLIENT FOR ANY SPECIAL, CONSEQUENTIAL, PUNITIVE OR OTHER INDIRECT DAMAGES (INCLUDING, BUT NOT LIMITED TO, LOST REVENUES OR PROFITS), WHETHER OR NOT NOTIFIED OF SUCH DAMAGES. This Section shall survive termination or expiration of this Agreement.

**7.** **Confidentiality.** Each party will use reasonable efforts to keep confidential all information and materials so designated by the other party and to limit access to such information and materials to those with a need to know for purposes of performing this Agreement. Notwithstanding the foregoing, each party acknowledges that information and materials shall not be deemed confidential for the purposes of this Agreement if such information and materials: (i) become publicly available through no wrongful act or breach of any obligation of confidentiality on the receiving party's part; (ii) are, at the time of disclosure, lawfully known to the receiving party without restriction on disclosure; (iii) are independently developed or obtained by the receiving party without breach of this Agreement; (iv) becomes available to the receiving party on a non-confidential basis from a source other than the disclosing party, provided such source is not bound by a confidentiality agreement with, or other contractual, legal or fiduciary obligation of confidentiality, to the disclosing party with respect to such information; or (v) are authorized for release by the disclosing party. In the event that a party is, in the context of a legislative, administrative or judicial proceeding, requested or required (by oral questions, interrogatories, regulations, orders, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar legal process) to disclose any confidential information, such party shall provide the other party with prompt written notice of any such request or requirement, if and to the extent permitted by law, and shall refrain from disclosure so that the other party may in its sole discretion and at its sole expense seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement. Agency shall have the right to utilize any publicly available work product to demonstrate examples of Agency's work and in order to seek industry awards for Agency's work. For the avoidance of doubt, the Confidentiality Agreement between the parties entered into on or about November 7, 2023 shall remain in full force and effect, and is not limited or superseded in any way by this Agreement.

**8.** **Non-Solicitation of Employees.** During the term of this Agreement and for one (1) year after its termination, Client will not, without the written consent of Agency, knowingly solicit (either directly or indirectly) any Agency employee with whom Client came into contact during the performance of this Agreement, for the purpose of engaging such employee as an employee, consultant, agent or other independent contractor. In the event Client does so solicit and employ or engage any person so employed by Agency, Client shall pay Agency a fee equal to the total amount of such employee's annual cash and non-cash compensation as a reimbursement to Agency of its recruitment and training costs. This Section shall survive termination or expiration of this Agreement.

**9.** **Choice of Law and Jurisdiction.** This Agreement shall be construed in accordance with the laws of the State of New York, regardless of any conflict of law rules. Any and all claims controversies, disputes, demands, counts, or causes of action arising out of, touching on, or relating to this Agreement (including, without limitation, its formation, performance, or alleged breach), shall be submitted to JAMS and shall be resolved exclusively by confidential binding arbitration in New York, New York, in accordance with the JAMS's rules for commercial arbitration by one arbitrator appointed in accordance with said rules. The arbitrator shall apply New York law, without reference to rules of conflicts of law or rules of statutory arbitration, to the resolution of any dispute. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

Notwithstanding the foregoing, the parties may apply to any court of competent jurisdiction for preliminary or interim equitable relief, or to compel arbitration in accordance with this paragraph, without breach of this arbitration provision.

**10.** **Compliance with Laws.** Client shall comply with, and be in compliance with, all applicable federal, state and municipal statutes, laws, ordinances and regulations, including, without limitation, those relating to privacy, security, environment, Occupational Safety and Health Administration, labor standards, and any required permits, licenses and certifications.

**11.** **Survival.** The respective rights and obligations of the parties set forth in this Agreement shall survive the expiration or termination of this Agreement to the extent necessary to the intended preservation of such rights and obligations.

**12.** **General**. This Agreement sets forth the entire agreement between the parties with respect to the subject matter hereof, supersedes all prior understandings and agreements relating thereto, and may not be modified except by a written agreement signed by both of parties. The language contained herein shall be construed as a whole according to its fair meaning, and neither party shall be deemed the draftsman of this Agreement or any part hereof, for purposes of any litigation which may arise hereafter between the parties. If any provision or portion of this Agreement shall be held for any reason to be unenforceable or invalid, the remainder of this agreement shall remain valid and enforceable between the parties just as if the provision held to be invalid or unenforceable had never been included in the Agreement. The section headings contained herein are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement. Client shall not assign, transfer, delegate, or subcontract any of its rights or obligations under this Agreement without the prior written consent of Agency. Any purported assignment or delegation in violation of the foregoing shall be null and void. Agency may at any time assign or transfer any or all of its rights or obligations under this Agreement without Client's prior written consent. Nothing contained herein shall be construed to constitute a partnership or joint venture between the parties. This Agreement hereto may be executed in multiple counterparts, each of which shall be deemed an original, and all of which shall constitute but one agreement. Copies of this Agreement, including any emailed PDF or copies, may be used in lieu of the originals for all purposes.

Your signature below confirms that you, as an authorized representative of Client, enter into this Agreement on behalf of Client.

| | |
|---|---|
| ACCEPTED AND AGREED: | ACCEPTED AND AGREED: |
| **BROWN RUDNICK, LLP** | **THE AGENCY PR GROUP LLC** |
| By: ____________________ | By: ____________________ |
| Name: __________________ | Name: Melissa Nathan |
| Title: __________________ | Title: CEO |

ACCEPTED AND AGREED:

**HOLLAND LAW FIRM LLC**

By: Eric D. Holland

Name: Eric D. Holland

Title: Owner / Partner

# Exhibit B

September 4, 2024

Kendra Barkoff Lamy
Managing Director
SKDKnickerbocker LLC
1150 18th St NW, Suite 800
Washington, DC 20036
Consulting Services Agreement

Dear Kendra,

As previously discussed, Nelson Mullins Riley & Scarbough LLP (Nelson Mullins) and Holland Law Firm, LLC ("HLF")are counsel to Janel Grant ("Client") in certain matters. This Agreement confirms that, with Client's authorization, Nelson Mullins and HLF are retaining SKDKnickerbocker LLC ("SKDK") to assist Nelson Mullins and HLF in their work. SKDK and Nelson Mullins and HLF are referred to herein collectively as "the Parties."

Nelson Mullins and HLF have been advising Client regarding a communication matter (the "Matter"). Nelson Mullins and HLF are engaging SKDK to provide public relations services in support of the Matter. SKDK will work under the direction of Nelson Mullins and HLF. SKDK agrees to provide consultation and public relations services in connection and in furtherance of the legal services Nelson Mullins and HLF are providing to Client. As part of these services, Kendra Barkoff Lamy of SKDK shall act as the primary spokesperson for Client. SKDK shall devote such time during the term of this agreement as is necessary to fulfill its obligations under this Agreement.

The work undertaken by SKDK in connection with this engagement is being done for and under the direction of Nelson Mullins and HLF and, accordingly, is considered attorney work product and/or covered by the attorney–client privilege. All communications, correspondence, instruments, and writings between and among Nelson Mullins, HLF, Client, and SKDK shall constitute attorney work product and/or attorney–client privileged materials (collectively "Confidential Information"). SKDK shall not disclose any Confidential Information to any third party without Nelson Mullins' and HLF's written consent. SKDK agrees to take all necessary steps to maintain the confidentiality of such materials and communications with Nelson Mullins and/or HLF and label all privileged documents as such. All Confidential Information shall remain the property of Nelson Mullins, HLF, and/or Client. SKDK reserves the right to retain copies of its own work product with suitable protection of confidential or proprietary information. Confidential Information shall not include any information that (i) is generally available to or becomes known to the public through no act of the recipient in breach of this Agreement; (ii) was previously known by the recipient as evidenced by written records through no act in breach of any confidentiality agreement; (iii) was independently developed by the recipient without the use of any Confidential Information of the disclosing party as evidenced by written records; or (iv) was disclosed to the recipient by a third-party under no obligation of

confidentiality to the disclosing party. SKDK agrees that if it receives a subpoena or any other formal or informal request for the production of any materials created pursuant to or otherwise encompassed by this Agreement, whether by any law enforcement agency or any other person or entity, it shall immediately notify Nelson Mullins and HLF and shall cooperate fully with Nelson Mullins and HLF, at Nelson Mullins' and HLF's sole cost, in responding to the subpoena or request. SKDK agrees that it shall invoke the attorney-client and/or work product privilege on Nelson Mullins' or HLF's or Client's behalf in response to any subpoena or legal demand for production and shall maintain such privilege until such time as SKDK is compelled by court order to disclose such information or is otherwise authorized to make such disclosure by Nelson Mullins, HLF, or Client. Nelson Mullins and HLF agree to reimburse SKDK for any costs it incurs in responding to the subpoena or request.

It is agreed that SKDK shall not work for or represent any person or entity who has asserted any position reasonably known to be antagonistic to that of Client in this Matter, if such an engagement would require SKDK to deal with any of the facts or issues relevant to the subject matter of this engagement. SKDK will notify Nelson Mullins and HLF immediately if any such potential conflicts come to its attention.

SKDK will not subcontract to other persons or entities for the performance of services for Client without Nelson Mullins' and HLF's prior consent, which consent may be withheld in Nelson Mullins' and HLF's sole discretion. Such consent may be conditioned on the subcontractor's making substantially the same representations and agreements required of SKDK in this Agreement.

SKDK will be compensated per month ("the "Consulting Fee") plus a administrative fee by Nelson Mullins and HLF for services provided from September 1, 2024 until February 1, 2025, and any renewal period. Nelson Mullins and HLF will also be responsible for all reasonable expenses incurred by SKDK associated with the conduction of consulting services, provided, however, that SKDK shall seek pre-approval from Nelson Mullins and HLF of any proposed expense that exceeds . All payments shall be due within 30 days after receipt of an invoice. In addition, SKDK shall be entitled to a success fee of payable from recoveries, whether in settlement or judgment, due to Ms. Grant as a result of her pending lawsuit against World Wrestling Entertainment, LLC, Vince McMahon and John Lauirinaitis (the "Success Fee"); the Success Fee is earned only if (a) aggregate recovery exceeds , and (b) this Agreement has not been terminated or, if terminated, was terminated less than six (6) months before any recovery.

The term of this Agreement is six (6) months from the date of the last signature below, and the Agreement will automatically renew for successive one-month periods unless one of the Parties gives notice of termination in accordance with this paragraph. Following the initial six (6) month term of this Agreement, the Parties may jointly agree to a new term. Any of the Parties have the option of terminating this Agreement, at any time and for any reason, provided that the terminating Party gives the other Party 30-days' notice in advance of termination of this

Agreement. In the event of termination, SKDK will be paid the Consulting Fee during the period between the date of notice and the effective date of termination.

SKDK will bill Nelson Mullins and HLF directly for services and will provide sufficient detail identifying services rendered and expenses incurred. SKDK will send copies of all invoices to Charles Munn of Nelson Mullins and Ann Callis of HLF so that they can indicate Nelson Mullins' and HLF's approval of payment. Nelson Mullins and HLF remains solely responsible for the payment of all fees or expenses associated with SKDK's work related to this engagement.

All provisions of this Agreement relating to the payment of fees and expenses and confidentiality will survive any termination of this Agreement. This constitutes the entire Agreement between the parties. If one or more of the provisions contained in this Agreement are held to be invalid by a court of competent jurisdiction, the remainder of this Agreement is severable therefrom and will continue in full force and effect.

Very truly yours,

By: Charles Munn
Charles Munn (Sep 9, 2024 11:54 EDT)
Name: Charles Munn
Partner, Nelson Mullins LLP

By: ann callis
ann callis (Sep 9, 2024 09:10 PDT)
Name: Ann Callis
Partner, Holland Law Firm, LLC

ACKNOWLEDGED AND AGREED TO this 5 day of September 2024, by

and behalf of SKDKnickerbocker LLC.

Jasmine Hooks
SKDKnickerbocker LLC
Jasmine Hooks, Chief Operating Officer

# Nelson Mullins Letter of Engagement FINAL

Final Audit Report 2024-09-09

| | |
|---|---|
| Created: | 2024-09-05 |
| By: | SKDK Contracts (Contracts@skdknick.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAyeuGlVl9yAyhvfYcGoW5A7VNOLanRY1I |

## "Nelson Mullins Letter of Engagement FINAL" History

Document created by SKDK Contracts (Contracts@skdknick.com)
2024-09-05 - 6:10:29 PM GMT- IP address: 152.179.120.22

Document emailed to Jasmine Hooks (jhooks@skdknick.com) for signature
2024-09-05 - 6:11:40 PM GMT

Email viewed by Jasmine Hooks (jhooks@skdknick.com)
2024-09-05 - 6:14:00 PM GMT- IP address: 104.47.59.254

Document e-signed by Jasmine Hooks (jhooks@skdknick.com)
Signature Date: 2024-09-05 - 6:15:22 PM GMT - Time Source: server- IP address: 65.206.179.34

Document emailed to mark.grider@nelsonmullins.com for signature
2024-09-05 - 6:15:24 PM GMT

Email viewed by mark.grider@nelsonmullins.com
2024-09-05 - 6:15:34 PM GMT- IP address: 40.83.213.64

Email viewed by mark.grider@nelsonmullins.com
2024-09-09 - 3:31:19 PM GMT- IP address: 20.29.104.211

Signer mark.grider@nelsonmullins.com entered name at signing as Charles Munn
2024-09-09 - 3:54:42 PM GMT- IP address: 4.38.244.218

Document e-signed by Charles Munn (mark.grider@nelsonmullins.com)
Signature Date: 2024-09-09 - 3:54:44 PM GMT - Time Source: server- IP address: 4.38.244.218

Document emailed to ann callis (acallis@hollandtriallawyers.com) for signature
2024-09-09 - 3:54:45 PM GMT

Email viewed by ann callis (acallis@hollandtriallawyers.com)
2024-09-09 - 3:54:57 PM GMT- IP address: 75.130.210.191

Document e-signed by ann callis (acallis@hollandtriallawyers.com)

Signature Date: 2024-09-09 - 4:10:30 PM GMT - Time Source: server- IP address: 75.130.210.191

Agreement completed.

2024-09-09 - 4:10:30 PM GMT

SKDK

Powered by
Adobe
Acrobat Sign