**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CARLON M. COLKER, M.D., an individual, and PEAK WELLNESS, INC., a Connecticut corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ANNE CALLIS, an individual, and HOLLAND LAW FIRM LLC, a Missouri limited liability company,<br><br>Defendants. | Case No.: 3:25-cv-00711-SFR |

**PLAINTIFFS' MOTION TO COMPEL COMPLETE RESPONSES TO PLAINTIFFS' DISCOVERY REQUESTS AND TO OVERRULE DEFENDANTS' IMPROPER PRIVILEGE AND WORK PRODUCT OBJECTIONS WITH INCORPORATED MEMORANDUM OF LAW**

Plaintiffs, CARLON M. COLKER, M.D. ("Dr. Colker") and PEAK WELLNESS, INC. ("Peak Wellness") (together, "Plaintiffs"), by and through the undersigned counsel and pursuant to Fed. R. Civ. P. 37, D. Conn. L. Civ. R. 37, and the Court's August 19, 2026 Order [Doc. 80], respectfully move for an order: (a) compelling Defendants, ANNE CALLIS ("Callis") and HOLLAND LAW FIRM LLC ("Holland Law") (together, "Defendants") to serve complete responses to the following discovery: Plaintiffs' First Set of Interrogatories to Callis (Nos. 6 and 8-17), Plaintiffs' First Set of Interrogatories to Holland Law (Nos. 5 and 8-17), Plaintiffs' First Requests for Production to Callis (Nos. 1 and 5-14), and Plaintiffs' First Requests for Production to Holland Law (Nos. 1, 5-8, 10, 12-20) (collectively, the "Discovery Requests"), (b) overruling Defendants' attorney-client privilege and work product objections to the Discovery Requests, and (c) conducting an *in camera* review of several documents withheld on the basis of those privileges

(Amended Privilege Log Entries 44-46, 58, 90-91, 93, 95-97, 100-102, 104, and 106).[1] In support of this motion, Plaintiffs state as follows:

## PRELIMINARY STATEMENT

This case is about a deliberate smear campaign. On October 15, 2024, Callis—a lawyer and former judge—did not confine herself to the courtroom. She emailed a press release to more than sixty reporters and staged a YouTube press conference for the express purpose of branding a respected, licensed physician by name—Dr. Colker—a criminal. She told the world that he "injected unknown substances" into a patient, "forced [the patient] to accept intravenous infusions of unknown contents," fed the patient "mystery pills," was "on [WWE's CEO Vince] McMahon's payroll," "routinely broke the doctor-patient trust," and "improperly with[held]" the patient's records. Doc. No. 1, ¶¶ 56, 58. These were not legal arguments. They were "definitive factual assertions," *Id.* at ¶ 60, of felony conduct, delivered to the press and the public—including every potential juror in this District.

Three undisputed facts expose this smear campaign for what it was. ***First***, Defendants already held the medical records that disproved the defamatory accusations. Defendants had received Dr. Colker's medical records on March 5, April 17, and August 30, 2024—records that [redacted] *See* Doc. 38 (filed under seal), Ex. A at pp. 106, 123, 128, 139, 152, 220, 264. Defendants falsely accused Dr. Colker anyway. ***Second***, Defendants made none of these

[1] Copies of Plaintiffs' First Set of Interrogatories to Callis, Callis' Response to Plaintiffs' First Set of Interrogatories, Plaintiffs' First Set of Interrogatories to Holland Law, Holland Law's Responses to Plaintiffs' First Set of Interrogatories, Plaintiffs' First Requests for Production to Callis, Callis' Responses to Plaintiffs' First Requests for Production, Plaintiffs' First Requests for Production to Holland Law, Holland Law's Responses to Plaintiffs' First Requests for Production, and Defendants' Amended Privilege Log are attached hereto as **Exhibits A through I**, respectively.


**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

defamatory accusations where they belonged—in a court filing. The contemporaneous opposition brief filed by the patient, Janel Grant ("Ms. Grant"), in the Bill of Discovery action "contained no reference whatsoever" to them. Doc. No. 1, ¶¶ 53, 70–72. Instead, Defendants reserved these accusations for the cameras. ***Third***, Defendants did not act alone. To build and broadcast these felonious accusations, Defendants worked with not one but two public-relations firms—SKDK and The Agency Group PR LLC—whose consultants drafted the press release, prepared "tough Q&A" scripts and media "talking points," and then tracked the "social media response" to confirm it was "decidedly in Janel's favor." This was a coordinated media operation, run by publicists, aimed at the public.

Having orchestrated that campaign in public, Defendants now try to bury it under the guise of the attorney-client privilege and work product doctrine. They withhold nearly the entire factual record of the operation—the basis for each accusation, the pre-publication investigation, and the communications with the two public relations firms—behind a blanket assertion that everything was "inextricably intertwined" with Defendants' representation of Ms. Grant and is therefore privileged. It was not, and it is not. The privilege protects confidential legal advice, and the work product doctrine protects litigation strategy. Neither was ever meant to arm a lawyer to defame a stranger to a litigation through a publicist and then seal the evidence. SKDK's own marketing describes its business as "shap[ing] the narrative before filings are made"[2]—the precise work of a media strategy firm, not a law firm.

Defendants' privilege theory fails for four independent reasons, each sufficient on its own. ***First***, the defamatory accusations made by Defendants were public, and the facts underlying them

---

[2] https://skdknick.com/when-the-courtroom-meets-the-newsroom-why-high-profile-litigation-requires-more-than-legal-expertise (last visited September 11, 2026).

are not privileged. The attorney-client privilege "only protects disclosure of communications." *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981). It "does not protect disclosure of the underlying facts." *Id.* ***Second***, the "intertwined" premise is demonstrably false. The press accusations differ materially from—and are far more inculpatory than—anything alleged in the underlying complaint in the Bill of Discovery Action. They therefore cannot be litigation communications, cannot be protected litigation strategy, and cannot be a "fair and accurate" report of any filing. ***Third***, communications with the public relations firms are not privileged merely because a lawyer was copied on them. And by disclosing those communications to public relations firms, Defendants waived the attorney-client privilege as to whatever was shared. ***Fourth***, Callis cannot use the privilege as a shield and a sword. She defends the truth of her accusations by pointing to "information relayed … by Patient" and her "review of Patient's medical records," and pleads truth, opinion, fair report, and absence of actual malice—yet refuses to produce the very materials those defenses depend on.

*Lively* is directly on point. There, on facts that mirror these—a coordinated "press and digital" campaign run through The Agency Group, the same firm retained here—the court *granted* a motion to compel and ordered the firm to produce the withheld communications, holding that ***"[a] media campaign is not a litigation strategy."*** *Lively v. Wayfarer Studios LLC*, 2025 WL 2606904, at *4–*6 (S.D.N.Y. Sept. 9, 2025) (emphasis added). Consistent with the Court's guidance at the discovery conference, Plaintiffs do not seek genuinely privileged litigation materials and do not ask the Court to review the challenged documents in their entirety. Plaintiffs ask the Court to overrule the objections as to the non-privileged categories identified below and to conduct *in camera* review of the discrete, identified portions of a targeted set of log entries that concern the press campaign.


**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

## BACKGROUND

### A. The Press Statements and the Two Underlying Litigations.

Callis represents Ms. Grant in *Grant v. WWE, McMahon, et al.*, No. 3:24-cv-90 (D. Conn.) (the "WWE Litigation"), and in a related Connecticut Superior Court pre-action petition, *Grant v. Colker*, No. FST-CV24-6068091-S (the "Bill of Discovery Action"). Doc. No. 1, ¶¶ 34, 46. No party has ever asserted a substantive claim against Plaintiffs in either proceeding. In the WWE Litigation, Plaintiffs were not parties at all, referred to only as "Celebrity Doctor" and "Alternative Clinic." Doc. No. 1, ¶ 37; Doc. No. 64, ¶ 37. In the Bill of Discovery Action—a pre-action petition brought under Conn. Gen. Stat. § 52-156a—Plaintiffs were named as respondents to a petition seeking records only, not as defendants to any asserted cause of action, and Ms. Grant expressly sought those records merely to "determine whether" potential claims might exist. *See* Complaint for Bill of Discovery ("Bill of Discovery") ¶¶ 1, 25–27 attached hereto as **Exhibit J**. On October 15, 2024—immediately after filing an opposition brief in the Bill of Discovery Action—Callis issued the press release and held the press conference, naming Plaintiffs and leveling the defamatory accusations quoted above. That opposition brief "contained no reference whatsoever to the defamatory statements Callis would later make." Doc. No. 1, ¶¶ 53, 70–72.

### B. The Press Statements Were Materially Different from the Underlying Filings.

A comparison of the press statements to the two underlying complaints—both in the record—shows that Callis did not repeat the litigation allegations to the press. She replaced qualified, hedged litigation allegations with categorical, criminal-sounding public accusations that appear nowhere in the filings:


**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

| What Callis told the press | What the underlying filings actually said |
|---|---|
| Colker "injected unknown substances into [her] body." (Doc. No. 1, ¶ 56) | Bill of Discovery ¶ 13: prescribed "adrenal supplement trays" and "instructed her to take the unmarked pills"—oral supplements, not injections; "unmarked," not "unknown." |
| "forced her to accept intravenous infusions of unknown contents." (Doc. No. 1, ¶ 58) | Bill of Discovery ¶ 14: "prescribed weekly I.V. infusions" described in a "drip lounge menu"—no "force," and the contents were menu-described. |
| directed her to take "mystery pills daily." (Doc. No. 1, ¶ 58) | Bill of Discovery ¶ 13: "unmarked pills," "purportedly addressing her symptoms of fatigue." |
| "routinely broke the doctor-patient trust" and "violated ethical and medical standards." (Doc. No. 1, ¶ 58) | Not alleged in either complaint. The Bill of Discovery pleads no ethical or professional violation by Dr. Colker. |
| "Dr. Colker was on McMahon's payroll." (Doc. No. 1, ¶ 58) | Bill of Discovery ¶ 22: on "information and belief," McMahon/WWE "paid each of Ms. Grant's medical bills." Payment of a patient's bills is not employment; neither filing alleged Dr. Colker was McMahon's employee or agent, i.e., on his "payroll." |
| "often coerced [her] into continuing her treatment." (Doc. No. 1, ¶ 58) | WWE Complaint[3] ¶ 117: Ms. Grant "felt pressured to do so"—her subjective feeling; the complaint's "coerced"/"forced" allegations concern McMahon's sexual assaults, not Colker's treatment. |
| Plaintiffs "improperly with[held]" and evinced "secrecy and evasion." (Doc. No. 1, ¶ 56) | Bill of Discovery ¶ 18: a dispute over electronic-versus-paper format—not concealment; records had in fact been produced. |

The Bill of Discovery Action is a pre-action petition that, by its terms, seeks records only to "determine whether" *potential* causes of action exist. **Ex. J** ¶¶ 1, 25–27. Its allegations are hedged throughout with "upon information and belief" and "purported." The press statements were nothing of the kind. Those statements were "definitive factual assertions," Doc. No. 1, ¶ 60, of

3 A true and correct copy of the WWE Complaint is attached hereto as **Exhibit K**.

completed criminal and ethical misconduct. The distinct gap—between tentative requests to investigate and flat, false accusations of guilt—lies at the heart of this case and dismantles Defendants' privilege theory.

**C. Defendants' Own Production Contradicts the Press Statements.**

The documents that Defendants have produced—Ms. Grant's Peak Wellness medical and billing records—confirm the gap. [redacted] *See* Doc. 38 (filed under seal), Ex. A at pp. 18, 24, 31, 32, 50, 55, 59, 73, 82, 94, 102, 106, 113, 180. [redacted] *See id.* at pp. 106, 123, 128, 139, 152, 220, 264. The "on McMahon's payroll" accusation fares no better. No one disputes that McMahon paid Ms. Grant's bills. But paying a patient's medical bills does not make the treating physician the payer's employee or agent—it does not put the physician on anyone's "payroll." The underlying filings alleged only that McMahon paid Ms. Grant's bills—on "information and belief" in the Bill of Discovery (¶ 22), and as bills "taken care of under McMahon's account" in the WWE complaint (¶ 117). Neither alleged an employment or agency relationship between Dr. Colker and McMahon. Whether Callis had any basis to convert third-party payment of a patient's bills into a public charge that Dr. Colker was "on McMahon's payroll" is precisely what Plaintiffs' discovery seeks and what Defendants are improperly withholding.


BRITO, PLLC
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

**D. Callis Possessed the Records She Claimed Were Withheld.**

The timing of Callis' "withholding" accusation is particularly revealing. Peak Wellness produced Ms. Grant's records to Defendants in successive tranches: printed records for the January 2021–February 2024 period on March 5, 2024, and a complete set of printed records dating back to the first visit (November 2019) on April 17, 2024. Doc. No. 1, ¶¶ 38–43. Defendants thus held a complete substantive set of the records months before they initiated the Bill of Discovery on July 1, 2024. Yet the petition alleged that "despite repeated requests, Dr. Colker and Peak Wellness have failed or refused to provide" the records. **Ex. J**, ¶ 18.

Any suggestion of a lingering dispute over the delivery of the medical records in electronic format is baseless. On July 16, 2024—the same day that Defendants filed a further Bill of Discovery submission—Peak Wellness's counsel sent the complete records in the native DrChrono electronic format, and Defendants' local co-counsel confirmed receipt in writing. Doc. No. 1, ¶¶ 44–45. Peak Wellness produced the records again, in the specific electronic format requested, on August 30, 2024. *Id.*, ¶ 51. By the time Callis told the press on October 15, 2024 that Plaintiffs had "improperly with[held]" records and engaged in "secrecy and evasion," she had already received the records four separate times—in both paper and the exact electronic format she demanded.

**E. The Two Public Relations Firms and the Privilege Log.**

Defendants used two public relations firms to build and run the media campaign. Callis' response to Interrogatory No. 4 identifies three SKDK personnel—Jade Klain, Kendra Barkoff, and Kevin Gerson—as "involved in the preparation, review, or approval of the Press Release [and] Press Conference." **Ex. B**, No. 4. Defendants' privilege log (served Sept. 3, 2026) identifies a second firm, The Agency Group PR LLC, and expressly labels all of these individuals as "PR Consultant[s]." **Ex. I**. SKDK holds itself out as providing "strategic communications" to "Fortune

500 companies … and political committees and candidates" to "manage a crisis, protect a brand, … or win an election"[4]; The Agency Group markets "reputation management" and "crisis" services[5].

What these firms actually did is spelled out in the withheld documents. Defendants' privilege log lists a "Media Coverage Report" (Entry 44), the "Colker Case Press Release / Media Advisory" draft sent to SKDK (Entries 45–46), a "Tough Q&A Document" (Entry 91), "Prep Docs for … Press Briefing" (Entry 93), "NBC/NewsNation Briefing Memo and Talking Points" (Entry 95), and "Filing Plan" and "tough Q & As" chains circulated among counsel and SKDK consultants (Entries 96–106)—each claimed as attorney-client privileged and/or work product. **Ex. I**. These are the tools of a press operation—talking points, briefing memos, coverage reports, and Q&A prep for reporters.

Defendants' own production makes the point. The Agency Group circulated "Colker media coverage" updates tracking press pickup and reporting that "the social media response … [was] decidedly in Janel's favor"[6]—media monitoring and reputation management, not the provision of legal advice.

## ARGUMENT

### I. Legal Standard.

In this District, the attorney-client privilege is "construe[d] … narrowly because it renders relevant information undiscoverable" and applied "only where necessary to achieve its purpose." *A&R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*, 2013 WL 6044342, at

---

4 https://skdknick.com/about/ (last visited September 11, 2026).

5 https://www.tagpr.com/about (last visited September 11, 2026).

6 A true and correct copy of the July 16, 2024 email is attached hereto as **Exhibit L**.



BRITO, PLLC
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

*1 (D. Conn. Nov. 14, 2013); *accord United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011). The party invoking the privilege bears the burden of establishing it, *id.,* and that burden "is not discharged by mere conclusory or ipse dixit assertions." *Lively v. Wayfarer Studios LLC*, 2025 WL 2606904, at *3 (S.D.N.Y. Sept. 9, 2025). Nor does the presence of a lawyer supply the missing showing: "the mere fact that a communication is made directly to an attorney, or an attorney is copied on a memorandum, does not mean that the communication is necessarily privileged." *A&R Body Specialty*, 2013 WL 6044342, at *5 (citation omitted).

The work product doctrine protects material prepared "because of" litigation, Fed. R. Civ. P. 26(b)(3)(A), but its purpose is narrow: it provides "a zone of privacy for strategizing about the conduct of litigation itself, not for strategizing about the effects of the litigation on … the media[] or on the public generally." *Calvin Klein Trademark Tr. v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000).

## II. The Public Accusations, and the Facts Underlying Them, Are Not Privileged.

A press release blasted to sixty reporters and a press conference streamed on YouTube are not confidential communications made to get legal advice, and they are not litigation strategy worked out in private. They were built for maximum public exposure—the opposite of confidentiality.

Even where a privileged communication does exist, the privilege "only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." *Upjohn*, 449 U.S. at 395. Plaintiffs are entitled to the facts on which each false and defamatory accusation rested—what Callis says she was told, and which record entries she says backed up each statement—no matter what privilege attaches to any document.


**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

Connecticut's litigation privilege reaches no further. It covers only "communications uttered or published in the course of judicial proceedings," *Khan v. Yale Univ.*, 347 Conn. 1, 19 (2023), and "[p]ublication to the news media is not ordinarily sufficiently related to a judicial proceeding to constitute a privileged occasion." *Kelley v. Bonney*, 221 Conn. 549, 576 (1992). A press release and a YouTube conference are publications to the news media, not statements made in a courtroom.

**III. The Press Statements Cannot Be Cloaked as Litigation Communications or Defended as a Fair Report.**

Defendants' entire privilege theory rests on one premise: that the press campaign was "inextricably intertwined" with the filing of the Bill of Discovery opposition brief. The filings themselves disprove it. As shown above, the specific accusations that Callis made to the press—injecting "unknown substances," "forc[ing]" infusions, "mystery pills," breaking "doctor-patient trust," a "payroll," and "improperly with[holding]" records—are materially different from, and materially more inculpatory than, the hedged allegations in the complaints in the Bill of Discovery Action or the WWE Litigation. Several of the statements appear in no filing at all.

That divergence defeats the work product claim. Work product protects "strategizing about the conduct of litigation itself." *Calvin Klein*, 198 F.R.D. at 55. Materials created to craft *public accusations that the litigation documents do not contain* were not prepared "because of" the litigation. They were prepared for a publicity campaign that ran well beyond it. Where a communication "would have been created in essentially similar form irrespective of the litigation," it is not work product. And a lawyer's decision to "conduct a media campaign … does not transform [her] coordination of a campaign into legal advice." *Lively*, 2025 WL 2606904, at *4 (quoting *Haugh v. Schroder Inv. Mgmt. N. Am. Inc.*, 2003 WL 21998674, at *3 (S.D.N.Y. Aug. 25, 2003)).


**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

The work product doctrine confirms the point from a second direction. Work product exists to create "a zone of privacy for strategic litigation planning" in an adversarial proceeding. But no substantive claim was ever alleged against Plaintiffs. They were not parties to the WWE Litigation, and the Bill of Discovery sought only records to "determine whether" potential claims might exist. **Ex. J**, ¶¶ 1, 25–27. Materials generated to publicize accusations against parties who face no asserted claim are not strategy "prepared in anticipation of" adversarial litigation with them. Nothing in the work product doctrine lets an attorney broadcast such accusations and then withhold the materials that produced them.

The same divergence independently defeats Defendants' fair report defense—and makes the materials bearing on it discoverable. Connecticut's fair report privilege applies only to a "fair and accurate" report of a judicial proceeding, and whether the defense even applies is a question of law. *Getachew v. L&S Invs., LLC*, 2026 WL 851408, at *13 (D. Conn. Feb. 26, 2026); *Idlibi v. Hartford Courant Co.*, 205 Conn. App. 360 (2021). A "report" that adds categorical accusations of criminal conduct absent from the filing is, by definition, neither fair nor accurate. Defendants cannot plead fair report as a defense (*see* Doc. No. 64, Aff. Defense No. 6), while withholding the very preparation materials that would show how far the press statements strayed from the filings. That comparison is not collateral—it is the merits.

## IV. Communications with the PR Firms Are Not Privileged, and *Lively* Requires Their Production.

*Lively* is directly on point and requires production here. It involved The Agency Group—the very firm Defendants used—and its consultants' PR communications in a defamation dispute arising from the same underlying controversy. After reviewing the withheld documents *in camera*, the court granted the motion to compel in substantial part, holding that the attorney-client privilege


**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

was defeated or waived, and ordering production of the subject documents. 2025 WL 2606904, at *4-6. The same result follows here, for three independent reasons.

*First,* these are publicity materials, not legal strategy. A lawyer may share a privileged communication with a public relations consultant without waiver only where the consultant is used "'to implement a specific legal strategy that require[s] the use of a public relations consultant'"—not merely to advise on media or reputational strategy. *Lively*, 2025 WL 2606904, at *4. Being "sensitive to public relations considerations … does not make the public relations … experts part of the legal strategy or integral to the … provision of legal advice." *Id.* The log here reflects exactly the work *Lively* held unprotected: media coverage reports, press-release drafts, talking points, and "tough Q&A" documents—all aimed at reporters and the public. This District has said the same for years: a lawyer's "talking points for use by [a] spokesman" are not privileged, and "matters conveyed to the attorney for the purpose of having the attorney fulfill the [non-legal] role do not become privileged by virtue of the fact that the [consultant] has a law degree." *A&R Body Specialty*, 2013 WL 6044342, at *2, *4 (D. Conn.) (attorney acting as lobbyist); *accord Calvin Klein*, 198 F.R.D. at 55; *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 430–31 (S.D.N.Y. 2013).

That the PR work was not aimed at the court or a jury does not save it – it is why the privilege fails. In *Lively,* the finding that the "public relations efforts were not directed at the Court, and… could not have properly been directed at a potential future jury given lawyers' ethical obligations against prejudicing adjudicative proceedings," was the reason the court held the privilege inapplicable. 2025 WL 2606904, at *4. Communications aimed at a tribunal are protected only where they implement a genuine legal strategy. Communications not aimed at a tribunal are, by definition, aimed at the media and the public, and "[a] media campaign is not a litigation strategy." *Id.* (quoting *Haugh,* 2003 WL 21998674, at *3).


**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

The point is more fundamental still as to Dr. Colker. A press campaign falsely accusing him of crimes cannot be "strategizing about the conduct of litigation itself," *Calvin Klein,* 198 F.R.D. at 55, because there is no litigation against Dr. Colker to conduct. He is not a party to the WWE Litigation, and no claim was ever asserted against him. The Bill of Discovery Action sought only records to "determine whether" claims might exist. **Ex. J**, ¶¶ 1, 25–27. Communications broadcasting accusations of criminal and ethical misconduct against a non-party who faces no claim cannot advance any litigation objective – there is no adversarial proceeding against him in which they could serve as strategy. The only conceivable function of these statements is to injure his reputation before the public. That is not privileged litigation strategy. It is the unprivileged publicity work that *Calvin Klein*, *Haugh*, and *Lively* place outside both doctrines—and it is the very conduct that Plaintiffs' defamation claim targets.

*Second,* disclosure to the PR firms waived the privilege. Even if any communication shared with SKDK or The Agency Group had once been privileged, sharing it with those firms waived the privilege as to what was disclosed. The rule is categorical. "The disclosure to a third party … of a communication with his attorney eliminates whatever privilege the communication may have originally possessed." *Lively*, 2025 WL 2606904, at *4. *Lively* applied that rule to the very configuration that Defendants present here, holding the attorney-client privilege waived as to every message chain on which an outside PR consultant appeared, because the defendants "could not, by including lawyers in those communications, shield the materials from discovery … under the attorney-client privilege." *Id.* The log entries showing client information and medical-records analysis circulated to SKDK consultants (*e.g.*, **Ex. I**, Entries 100–104) share the same defect and lost any attorney-client protection they may once have had.


**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

*Third,* to the extent Defendants invoke work product, *Lively* supplies the remedy—not a shield. *Lively* recognized that work-product protection, unlike the attorney-client privilege, is not automatically waived by disclosure to a retained PR firm that keeps the material confidential, and that where legal strategizing and PR advice are so "intertwined . . . [that they] cannot be disentangled," the material may be withheld. *Id.* at *5. But that qualification is the start of the analysis, not the end. The *Lively* court did not accept an "intertwined" label at face value. It ordered that the documents be produced for *in camera* inspection, reviewed each one, and sorted them message by message – protecting only what was "pure legal strategizing" or genuinely inextricable, and compelling production of every portion that was "pure public relations advice," identified down to individual messages and Bates ranges. *Id.* at *5-6. That is the framework that Plaintiffs invoke. A blanket "intertwined" assertion across an entire log is precisely what *Lively* declined to credit, and the remedy that follows is an *in camera* review with production of all portions that are pure public relations advice—which, on this log, is the bulk of what Defendants withhold.

**V. The Interrogatories and Requests for Production Seeking the Factual Basis for Each Accusation Ask for Facts and Non-Privileged Documents.**

Many of the disputed requests simply ask Defendants to state the facts and produce the non-privileged documents that supported each public accusation. Interrogatories Nos. 8–17 to Callis and Nos. 8–17 to Holland Law each ask Defendants to "*[d]escribe in detail the factual basis for*" a specific statement—that Plaintiffs "forced" Patient to accept infusions of "unknown contents," "injected unknown substances," directed "unlabeled pills," "routinely broke doctor-patient trust," that Dr. Colker "violated ethical and medical standards" and was "on McMahon's payroll," and the like. *See* **Exs. A, C**. The parallel document requests—Requests Nos. 5–14 to Callis and Nos. 12–20 to Holland Law—ask for the documents and communications "concerning"


**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

those same accusations. *See* **Exs. E, G.** Together, these requests seek the evidentiary foundation of the very statements on which Plaintiffs' defamation claim is built.

Discovery of this kind is expressly proper. An interrogatory "is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact," Fed. R. Civ. P. 33(a)(2), and a party is entitled to "the factual content of [its] opponent's claims with a reasonable degree of precision." *Harlem River Consumers Coop., Inc. v. Associated Grocers of Harlem, Inc.*, 64 F.R.D. 459, 461–62 (S.D.N.Y. 1974). This District applies that rule on a motion to compel. In *Omega Engineering, Inc. v. Omega, S.A.*, the court granted a motion to compel and ordered the responding party to "provide the factual basis (as opposed to the legal basis) for each affirmative defense it has asserted," rejecting the same boilerplate privilege and work product objections that Defendants raise here. 2001 WL 173765, *5 (D. Conn. Feb. 6, 2001). The court held that "[t]he mere incantation of" the words attorney-client privilege and work product "is insufficient to carry" the objecting party's burden, that "[b]lanket assertions" of privilege will not do, and that a party may not use "strained and overly technical interpretations" of a request "to avoid its obligation under the broad discovery rules." *Id.* at *4. The court ordered the documents produced and, for anything genuinely withheld, required a compliant privilege log. *Id.* at *6.

Neither privilege applies to what these requests actually seek. The attorney-client privilege "only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." *Upjohn*, 449 U.S. at 395. And the work product doctrine, which protects an attorney's "mental impressions, conclusions, opinions, or legal theories," Fed. R. Civ. P. 26(b)(3)(B), "furnishes no shield against discovery, by interrogatories or by deposition, of the facts" that a party or its counsel has learned. *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). Facts do not become privileged because a lawyer gathered them, and Plaintiffs


**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

do not seek Defendants' private litigation analysis. They seek the facts that purportedly support each accusation, and the non-privileged documents concerning those accusations—including the very records that Plaintiffs themselves produced. Nor can Defendants recast the requests as an impermissible demand for their mental impressions. The work product doctrine secures "a zone of privacy for strategizing about the conduct of litigation itself, not for strategizing about the effects of the litigation on … the media[] or on the public generally." *Calvin Klein*, 198 F.R.D. at 55. Any evaluation that Defendants performed was not marshaled to litigate a claim against Plaintiffs—there is none—but to compose and publish a press release falsely accusing a non-party of crimes. That is not protected litigation strategy, and to the extent Defendants nonetheless rest their defenses on what they reviewed and concluded before publishing, they have placed that material at issue and waived any protection it might otherwise have carried, as set forth below.

Defendants' own responses confirm that facts, not privileged strategy, are at stake. To every one of the factual-basis interrogatories, Defendants objected on privilege and work product grounds and then, "[w]ithout waiving" the objection, answered that each accusation was "based upon information relayed … by Patient" and/or "a review of Patient's medical records from Peak Wellness." Defendants thus identified the *sources* of that factual basis while withholding the *substance*—what those sources said, and which record entries they say support each accusation. To the parallel document requests, Defendants objected in identical, copy-and-pasted terms, adding only that Plaintiffs' use of the word "allegations" in the requests is "misleading," and then produced nothing but Ms. Grant's own medical records that Plaintiffs gave them. A quibble over the word "allegations" is exactly the kind of "strained and overly technical" reading that *Omega* forbids, and identical boilerplate repeated verbatim across a dozen requests is the "blanket assertion" that neither *Omega* nor *A&R Body Specialty* will countenance.


**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

The remaining objections fare no better. Holland Law's Responses to Requests Nos. 8 and 10 and Callis' Response to Request No. 1—concerning the receipt, review, and discussion of Ms. Grant's medical records, and any knowledge that the public statements were inconsistent with them—are met with a work product objection on the theory that any discussion of the records "speak[s] directly to defendant's mental impressions." *See* **Ex. F**, No. 1; **Ex. G**, Nos. 8, 10. But the records themselves are pure fact; they originated with Plaintiffs, and whether Defendants possessed records that contradicted Callis' accusations is central to the issue of actual malice, not attorney strategy. *Herbert v. Lando*, 441 U.S. 153, 169–75 (1979). Holland Law's Response to Request No. 1 and Callis' Response to Request No. 15—seeking communications with the media referencing Plaintiffs—are met only with a "vague" and "irrelevant" objection (*see* **Ex. F**, No. 1; **Ex. H**, No. 15), but communications with reporters about the very accusations at issue are plainly relevant to a defamation claim built on a media campaign, and an unsupported relevance objection does not satisfy Defendants' burden. *Omega,* 2001 WL 173765, at *5. To the extent that any specific document within these categories reflects genuine legal strategy rather than fact, the remedy is a particularized privilege log and, where disputed, *in camera* review—not the blanket refusal to produce that Defendants have interposed.

## VI. Defendants Cannot Use the Privilege as a Sword and a Shield.

A party impliedly waives the privilege when its own affirmative act puts protected information at issue and applying the privilege would deny the opponent access to information vital to the case. *Walsh v. Seaboard Sur. Co.*, 184 F.R.D. 494, 496 (D. Conn. 1999); *In re County of Erie*, 546 F.3d 222, 228 (2d Cir. 2008). The waiver is triggered when a party "asserts a factual claim the truth of which can only be assessed by examination of a privileged communication." *Walsh*, 184 F.R.D. at 496; *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991).


**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

That is exactly what Callis has done. Answering Interrogatories Nos. 8–17, she invokes privilege but then answers that each statement was "based upon information relayed … by Patient" and/or "a review of Patient's medical records." *See* **Ex. B**, Nos. 8-17. She thus relies on the substance of those materials to establish the purported truth of her accusations while refusing to produce them. Callis' affirmative defenses of substantial truth, opinion, fair report, and lack of actual malice (*see* Doc. No. 64, Aff. Defenses Nos. 2, 4, 5, 6) compound the waiver. Each defense turns on what Callis knew and reviewed before publishing. Callis cannot rest her defenses on those materials and simultaneously withhold them from Plaintiffs who are entitled to test them.

The privilege waiver is not a matter of Plaintiffs seizing on a stray phrasing. Since the parties first met and conferred in June 2026, Plaintiffs have repeatedly identified this issue in the interrogatory responses—raising it again at the discovery conference and again at the follow-up meet and confer. On each occasion, Defendants represented that they would revise the responses to address this issue. Despite those representations, which Plaintiffs relied on, Defendants never did. Each disputed response stands today exactly as initially served, and Defendants continue to stand behind them – asserting the substance of Ms. Grant's statements and medical records as their defense while refusing to produce the underlying information.

## VII. Callis' Pre-Publication Investigation and State of Mind Are Discoverable.

Because Plaintiffs allege (but are not actually required to prove) actual malice, Callis' pre-publication investigative process—"what she knew, when she knew it, what she did and did not investigate"—is discoverable. *Herbert v. Lando*, 441 U.S. 153, 169–75 (1979). That she is a lawyer rather than a journalist affords her no greater immunity from the inquiry, all the more so because she voluntarily took on the role of publicist.


**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

Callis' own responses confirm why the inquiry is necessary. She admitted (in response to Plaintiffs' Requests for Admissions ("RFA") No. 1, a true and correct copy of which is attached hereto as **Exhibit M**, that she consulted no one but Ms. Grant, yet denied (*see id.,* No. 2) that she conducted no independent investigation—representing that she did investigate, while refusing to say what that investigation consisted of. And her stated basis for the "withholding" accusation (*see* **Ex. B**, No. 10)—her "personal experience attempting to retrieve" the records—cannot be squared with her own admission that she received the records on four separate occasions, beginning months before she first alleged withholding in the Bill of Discovery and continuing well before she repeated the charge to the press. Doc. No. 1, ¶¶ 38–45, 51. What Callis knew about the records, and when she knew it, is the heart of the actual malice inquiry, and it is exactly what Defendants refuse to disclose.

## VIII. The Court Should Conduct an *In Camera* Review of Targeted Entries.

Consistent with the Court's direction, Plaintiffs identify below a discrete set of entries in Defendants' privilege log (*see* **Ex. I**) that concern the press campaign and are most likely to contain severable, non-privileged material. Plaintiffs respectfully request that the Court review, at a minimum, the portions described—the media-relations, publicity, and press-statement-drafting content—and order production of those portions, while permitting Defendants to withhold any genuinely severable legal-strategy content. This is the disentangling exercise that *Lively* prescribes. 2025 WL 2606904, at *5–*6.

| Log Entry | Log description (PR firm involved) | Portion for in camera review / basis |
|---|---|---|
| 44 | "9/26 Media Coverage Report — Documentary Coverage" (C. Munn to Grant, Callis) | Entire entry: a media-monitoring report is pure PR, not legal advice or litigation strategy. |


**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

| | | |
|---|---|---|
| 45–46 | "Colker Case Press Release / Media Advisory" draft and response (to SKDK's K. Barkoff) | The press-release/media-advisory draft and any transmittal or edit comments directed to publication—the core defamatory instrument; sever only embedded advice about the opposition brief itself. |
| 58 | "Peak Wellness" — attorney "opinion regarding records" shared with consultant C. Hurley (The Agency Group) | The portion shared with the PR consultant: attorney-client protection waived by disclosure to a non-lawyer publicist. |
| 90 | "Janel Case Timeline" revising "case narrative" (Callis, team, SKDK's Klain/Barkoff) | Portions concerning the public case narrative/media timeline, as distinct from litigation chronology prepared for court. |
| 91 | "Tough Q&A Document" (from SKDK's J. Klain) | Entire entry: press Q&A prepared by a PR consultant is publicity material; disclosure to/from SKDK also waives attorney-client protection. |
| 93 | "Prep Docs for Today's Press Briefing" (from SKDK's J. Lee) | Entire entry: press-briefing preparation is publicity, not legal advice. |
| 95 | "NBC/NewsNation Briefing Memo and Talking Points" (SKDK consultants) | Entire entry: media talking points are pure PR. |
| 96–97 | "Filing Plan for Colker Opp'n" chain (includes SKDK's Barkoff, Gerson) | Portions concerning timing/coordination of the press rollout with the filing (the "plan" to publicize); sever pure brief-editing content. |
| 100 | "Medical Records Notes" chain circulated to SKDK's Barkoff and J. Hall | The medical-records analysis as shared with the PR consultants: attorney-client protection waived; underlying facts not protected. |
| 101–102 | "Filing Plan for Colker Opp'n" continuations (SKDK's Barkoff, Klain, Gerson) | Portions addressing the publicity/press-timing strategy shared with SKDK. |
| 104 | "bumping the tough Q & As" (SKDK's Barkoff) | Portions concerning the press Q&A and its release; PR content. |
| 106 | "Press Call Briefing" and "Janel Tough Q&As … [UPDATED WITH LAWYER FEEDBACK]" (from SKDK's J. Klain) | The press-call briefing and Q&A attachments: publicity documents authored/circulated by SKDK; the "lawyer feedback" reflects editing of public statements, not confidential legal advice. |

Plaintiffs have deliberately limited this request to a discrete set of entries most clearly tied to the press campaign, rather than asking the Court to review the log in its entirety. That focus


**Brito, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

reflects Plaintiffs' effort to present the Court with a manageable, high-priority set—not any concession that the remaining entries are properly withheld. Plaintiffs expressly reserve the right to seek review of the additional entries, and to challenge Defendants' privilege designations more broadly, should that prove necessary.

Should the Court find it useful, the record would also support an *in camera* review under the crime-fraud (or tort) exception, because communications in furtherance of a tort are not privileged, *Olson v. Accessory Controls & Equip. Corp.*, 254 Conn. 145, 175–77 (2000), and the threshold showing for review is satisfied by "a … good faith belief by a reasonable person" that review may reveal supporting evidence, *United States v. Zolin*, 491 U.S. 554, 572 (1989). Plaintiffs need not press that ground at this time, however, because the targeted review above resolves the dispute on narrower, waiver and scope grounds.

## CONCLUSION

WHEREFORE, Plaintiffs respectfully request that the Court: (a) grant this Motion; (b) overrule Defendants' attorney-client privilege and work-product objections as set forth above; (c) compel Callis to serve complete answers to Interrogatories Nos. 6 and 8–17; (d) compel Holland Law to serve complete answers to Interrogatories Nos. 5 and 8–17; (e) compel Callis to properly respond to, and produce all non-privileged documents responsive to, Requests for Production Nos. 1 and 5–14; (f) compel Holland Law to properly respond to, and produce all non-privileged documents responsive to, Requests for Production Nos. 1, 5–8, 10, and 12–20; (g) conduct *in camera* review of the log entries listed above and order production of the non-privileged portions; and (h) grant such further relief as the Court deems just and proper.


**BRITO, PLLC**
2121 Ponce De Leon Boulevard, Suite 650 | Coral Gables, Florida 33134
Telephone: (305) 614-4071

Date: September 11, 2026

Respectfully submitted,

By: */s/ Alejandro Brito*

**Alejandro Brito**
Florida Bar No. 098442
*Pro Hac Vice Admitted*
Primary: abrito@britopllc.com
Secondary: apiriou@britopllc.com
**Jalaine Garcia**
Florida Bar No. 58632
*Pro Hac Vice Admitted*
Primary: jgarcia@britopllc.com
**BRITO, PLLC**
2121 Ponce de Leon Boulevard
Suite 650
Coral Gables, FL 33134
Office: 305-614-4071

**Dennis M. Durao**
KARSTEN & TALLBERG, LLC
500 Enterprise Drive
Suite 4B
Rocky Hill, CT 06067

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on September 11, 2026 upon:

Timothy Gondek
Hannah Meyers
LEWIS BRISBOIS BISGAARD & SMITH, LLP
185 Asylum Street, Suite 2603
Hartford, Connecticut 06103
Timothy.Gondek@LewisBrisbois.com
Hannah.Meyers@LewisBrisbois.com
hartfordeservice@lewisbrisbois.com

Alexa T. Millinger
William S. Fish, Jr.
HINCKLEY ALLEN & SNYDER LLP
20 Church Street, 18th Floor
Hartford, Connecticut 06103
amillinger@hinckleyallen.com
wfish@hinckleyallen.com

*Counsel for Defendants*

By: /s/ *Alejandro Brito*