**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CARLON M. COLKER, M.D., an individual, and PEAK WELLNESS, INC., a Connecticut corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ANNE CALLIS, an individual, and HOLLAND LAW FIRM LLC, a Missouri limited liability company,<br><br>Defendants. | Case No.: 3:25-cv-00711-SFR<br><br>September 16, 2026 |

**DEFENDANTS' REPLY BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL**

Defendants Ann Callis and Holland Law Firm LLC ("Defendants") respectfully submit this reply brief in opposition to Plaintiffs' Motion to Compel Complete Responses to Plaintiffs' Discovery Requests and to Overrule Defendants' Improper Privilege and Work Product Objections ("Motion to Compel"). Plaintiffs' Motion fundamentally mischaracterizes both the law and the record. Throughout their brief, Plaintiffs conflate two fundamentally distinct concepts: (1) the publicly available *facts* underlying the statements at issue in this case, which Defendants have already identified in their interrogatory responses; and (2) the *privileged communications* between Janel Grant and her attorneys, and the *attorney work product* generated in connection with two separate litigated matters—the WWE Litigation and the Bill of Discovery action—in which

Defendants serve as counsel to Ms. Grant. Plaintiffs are entitled to the former. They are not entitled to the latter.

What makes this dispute distinct from much of the relevant case law, and what Plaintiffs' Motion largely ignores, is that the privilege protections at issue do not pertain to *this* litigation. Defendants are upholding the attorney-client privilege of a *non-party client*, Janel Grant, and protecting work product generated in two *other* litigated matters, one of which remains pending before this very Court. The attorney-client privilege belongs to the client—not the attorney—and Ms. Grant has not waived it as to all her communications with counsel. Callis, as Grant's attorney, has an ethical obligation not to reveal communications with her client.

Notably, this dispute is narrower than Plaintiffs' brief suggests. The parties largely agree on the governing legal principles. Both sides recognize that the attorney-client privilege and work product doctrine can extend to communications shared with public relations consultants when those consultants are integrated into a litigation team to implement a legal strategy. Plaintiffs themselves acknowledge that where "legal strategizing and PR advice" are "intertwined . . . [and] cannot be disentangled, the material may be withheld." (Pls.' Br. at 14, quoting *Lively*, 2025 WL 2606904, at *5). Both parties cite *Calvin Klein* for the proposition that privilege attaches where "the public relations firm needs to know the attorney's strategy in order to advise as to public relations, and the public relations impact bears, in turn, on the attorney's own strategizing." 198 F.R.D. at 55. Both sides agree that the *Lively* framework—distinguishing "pure legal strategizing" (protected) from "pure public relations advice" (not protected), applied on a document-by-document basis, is the appropriate analytical tool. Both sides agree that *in camera* review is the proper mechanism to apply that framework. And both sides accept the *Upjohn* principle that the privilege "only protects disclosure of communications" and "does not protect disclosure of the

underlying facts." 449 U.S. at 395; (Pls.' Br. at 11, 16–17). The dispute, then, is not about what the law requires—it is about how that law applies to the facts of this case. Defendants maintain that the retention agreements, the nature of the high-profile litigation, and the integrated role of TAG and SKDK bring these communications within the protected zone. Plaintiffs disagree. That factual question is precisely what the Court's *in camera* review is designed to resolve.

## ARGUMENT

### I. The Attorney-Client Privilege Belongs to Ms. Grant and Cannot Be Waived by Defendants.

As set forth in Defendants' opening brief, the attorney-client privilege belongs to the client—not the attorney—and may only be waived by the client. Ms. Grant is not a party to this action, has not waived the privilege, and has not authorized its waiver. Defendants—as her attorneys—have an ethical obligation to maintain it. (Defs.' Br. at 10–11). Plaintiffs cite no authority for the sweeping proposition that a non-party client's privilege can be overridden in a separate action to which the client is not a party and has not consented. To the extent any arguable waiver might exist, it could extend no further than the specific information that the client authorized to be communicated publicly—a far cry from the wholesale disclosure Plaintiffs demand.

### II. The PR Firms Were Retained as Part of a Litigation Strategy, and Their Inclusion Does Not Waive Privilege.

As Defendants' opening brief established, courts in this Circuit consistently recognize that the attorney-client privilege and work product doctrine extend to communications shared with PR consultants retained to assist with litigation strategy. *Calvin Klein Trademark Tr. v. Wachner*, 198

F.R.D. 53, 55 (S.D.N.Y. 2000)(Defs.' Br. at 12–19.) Plaintiffs do not meaningfully dispute this legal framework—they simply misapply it to the facts.

Plaintiffs rely heavily on *Lively v. Wayfarer Studios LLC*, 2025 WL 2606904 (S.D.N.Y. Sept. 9, 2025), as though it compels wholesale production of every communication involving a PR consultant. It does nothing of the kind. A complete reading of *Lively* reveals that the decision actually *supports* the approach Defendants have taken in this case. The *Lively* court explicitly held that the work product doctrine protects attorney communications shared with PR consultants when those communications constitute "pure legal strategizing" or are "so intertwined with messages that contain public relations advice that they cannot be disentangled." *Id.* at *5. This is precisely the protection Defendants assert here.

First, the *Lively* court did not hold that all PR-related communications must be produced. To the contrary, the court conducted a document-by-document analysis, reviewing each communication *in camera* and distinguishing between materials that could be withheld and those that must be produced. *Id.* at *5–6. The court held that "[c]ertain of the communications . . . involve pure legal strategizing or are so intertwined with messages that contain public relations advice that they cannot be disentangled"—and those materials "may be withheld on the basis of work-product privilege." *Id.* at *5.

Second, the *Lively* court reaffirmed the principle from *Calvin Klein*, *supra*, that work product protection is not waived when shared with PR consultants. As the court explained, "an otherwise valid assertion of work-product protection is [not] waived with respect to an attorney's own work-product simply because the attorney provides the work-product to a public relations consultant whom he has hired and who maintains the attorney's work-product in confidence." *Id.* at *5 (quoting *Calvin Klein*, 198 F.R.D. at 55). The court further recognized that this protection is

"especially so if . . . the public relations firm needs to know the attorney's strategy in order to advise as to public relations, and the public relations impact bears, in turn, on the attorney's own strategizing as to whether or not to take a contemplated step in the litigation itself." *Id.* This describes exactly the relationship between Defendants and their PR consultants here, where the PR strategy was inextricably linked to the litigation filing strategy in both the WWE Litigation and the Bill of Discovery action.

Third, the *Lively* court's holdings on attorney-client privilege—which went against the privilege claimants in that case—are distinguishable and inapplicable here. The *Lively* court found that communications lost attorney-client privilege when shared with third parties because the privilege claimants "failed to establish that [the PR consultants'] inclusion in these messages was either necessary or actually done for the purpose of implementing a specific 'legal strategy.'" *Id.* at *4–5. Critically, the court based this finding on the absence of evidence that the PR consultants were formally retained as part of the legal team. Here, by contrast, the SKDK Agreement expressly provides that all work is done "for and under the direction of" the law firms and "is considered attorney work product and/or covered by the attorney-client privilege." The contractual integration of these consultants into the litigation team is far more robust than what was present in *Lively*, where no such retention language existed.

Additionally, attached hereto is the affidavit of defendant Ann Callis. Exh. A. This affidavit establishes that Callis, as counsel for Grant and in concert with her co-counsel from Nelson Mullins LLP, retained both The Agency Group and SKDK in 2023 and 2024, respectively, to provide litigation support in the form of public relations consulting in both the WWE Litigation and the Bill of Discovery action. Callis Aff., Exh. A, ¶¶ 9, 12-14. The retention of both TAG and SKDK was necessary where Callis and her co-counsel understood that they lacked the requisite

experience with high-profile litigation such as the WWE Litigation with respect to the potential media exposure of such a case and the complications of the same. Id., ¶¶ 5-7. The decision to hire both TAG and SKDK was borne out of a need to understand and evaluate the impact of the media landscape and public relations upon the litigation, and vice versa, in order to properly represent the client. Id., ¶ 8. The attorneys representing Grant retained TAG and SKDK to provide what they felt was an essential litigation function, and the duties of both TAG and SKDK included drafting certain documents and communications, reviewing materials related to the litigations, and advising the litigation team accordingly. Id., ¶¶ 10-11, 14, 16. These facts further support the defendants' argument that the inclusion of its PR consultants was done to implement a specific and essential legal function and strategy, and further that the public relations aspects, such that they were, were so intertwined with the legal strategizing that they cannot be disentangled.

Finally, the *Lively* court highlighted that where the communications involve "pure legal strategizing or are so intertwined with messages that contain public relations advice that they cannot be disentangled," they are protected. *Id.* at *5. Where communications are for "pure public relations advice" divorced from legal strategy, they are not. *Id.* Defendants have already submitted the disputed documents for this Court's *in camera* review, and the Court should apply *Lively*'s framework to protect those communications that reflect pure legal strategizing or that are so intertwined with legal advice that they cannot be disentangled—which describes the vast majority of the documents at issue here.

## III. The Work Product Doctrine Protects the Withheld Documents.

Defendants' opening brief catalogued the specific documents at issue and demonstrated that many contain quintessential opinion work product: attorney strategy discussions, mental impressions, and legal theories. (Defs.' Br. at 14–22.) Plaintiffs cannot demonstrate the

"substantial need" required to overcome even ordinary work product protection, let alone make the "highly persuasive showing" necessary to overcome opinion work product.

As set forth in Section II, supra, work product protection extends to materials shared with agents and consultants integrated into the litigation team. The *Lively* court reaffirmed this principle, holding that "an otherwise valid assertion of work-product protection is [not] waived with respect to an attorney's own work-product simply because the attorney provides the work-product to a public relations consultant whom he has hired and who maintains the attorney's work-product in confidence." 2025 WL 2606904, at *5. Accordingly, the sharing of work product with TAG and SKDK—consultants contractually integrated into the litigation team under the agreements discussed above—does not waive the protection.

### IV. The Plaintiffs' "Sword and Shield" Argument is Misleading.

Plaintiffs argue that the Defendants have impliedly waived the privilege by invoking it as a "sword and shield"—specifically, by answering interrogatories stating that each accusation was "based upon information relayed . . . by Patient" and/or "a review of Patient's medical records." This argument misapprehends the doctrine of implied waiver.

An implied or "at issue" waiver occurs only when a party *affirmatively injects* privileged information into the litigation as an element of a claim or defense, such that fairness requires disclosure. *Walsh v. Seaboard Sur. Co.*, 184 F.R.D. 494, 496 (D. Conn. 1999). Defendants' interrogatory responses do not remotely satisfy this standard. Identifying the *categories* of information upon which statements were based—"information relayed by Patient" and "a review of Patient's medical records"—is standard discovery practice. It identifies the *type* of sources consulted, not the *substance* of privileged communications. Defendants did not quote from any privileged communication. They did not describe the content of any attorney-client exchange.

They did not rely on the privilege as an affirmative element of any claim or defense. They simply answered the interrogatories in the manner that federal practice requires: by identifying the general nature of the information sources while expressly preserving their privilege objections. Even assuming *arguendo* that the public dissemination of certain information in the Press Release and Press Conference could support some limited finding of waiver, any such waiver would be confined to the specific information actually disclosed publicly—not the broader universe of privileged communications, attorney analysis, and work product that Plaintiffs seek to compel.

Indeed, each of Defendants' interrogatory responses is expressly prefaced "without waiving" the privilege objection. A party does not waive a privilege by providing a partial response to a discovery request while expressly invoking the privilege as to additional detail. The sword-and-shield doctrine requires that the party *affirmatively rely on privileged information*—not that the party answer an interrogatory in good faith while maintaining a privilege objection.

It cannot be the law that a defamation defendant automatically opens itself up to disclosure of privileged communications by referencing them in its defense. If this were the case, anyone could bring a meritless defamation action solely for the purpose of accessing privileged communications. There is no basis for the extraordinary remedy of piercing the attorney-client privilege wholesale to explore a defense that every defamation defendant asserts. If the Court were to find any waiver, it should be limited in scope to the discrete factual information that was actually conveyed to the public through the Press Release and Press Conference, and should not extend to the underlying privileged communications, litigation strategy, or work product from which those public statements may have drawn.

## V. The Press Statements Were Connected to the Underlying Litigation, Not an Independent Smear Campaign.

Plaintiffs' characterization of the October 15, 2024 Press Release and Press Conference as a standalone "smear campaign" untethered to any litigation is contradicted by the undisputed record. The Press Release itself expressly referenced "a new legal filing in Connecticut state court against Dr. Carlon Colker." The Press Conference was held in connection with that filing. These are the hallmarks of a litigation-related communication strategy accompanying a significant court filing.

As Defendants demonstrated in their opening brief, the intertwined nature of the WWE Litigation and the Bill of Discovery action, combined with the extraordinary media scrutiny attending those cases, made public relations management an integral component of the legal strategy. Many of the documents at issue—including Items 96–97, 101–102, and 105–106—involve discussions of the "filing plan" for the opposition brief, which necessarily involved consideration of how the filing would be perceived publicly given the high-profile nature of the WWE Litigation.

Plaintiffs' reliance on *Calvin Klein* for the proposition that the work product doctrine protects only 'strategizing about the conduct of litigation itself, not for strategizing about the effects of the litigation on . . . the media' misreads that decision. As discussed in Section II, *supra*, *Calvin Klein* itself recognized that where the PR firm's knowledge of litigation strategy bears on the attorney's own strategizing about contemplated litigation steps, the communications are protected. 198 F.R.D. at 55. That is precisely the dynamic at work here.

## VI. Production Would Prejudice Non-Party Janel Grant's Ongoing Litigation Interests.

As Defendants' opening brief explained (Defs.' Br. at 9–10), forced production would severely prejudice Ms. Grant, a non-party whose WWE Litigation (*Grant v. WWE, McMahon, et*

*al.*, No. 3:24-cv-90) remains pending in arbitration.[1] Given the unique dynamic where the privileged communications sought *relate to a separate litigation matter, d*isclosure would lay bare Grant's litigation strategy and confidential communications, information that could be exploited to her severe detriment in a case involving allegations of sexual assault and trafficking by powerful corporate actors which is now set for arbitration.

Should the Court determine that any of the disputed documents must be produced, Defendants respectfully request that the Court adopt the *Lively* framework discussed in Section III, *supra*—distinguishing between "pure legal strategizing" (protected) and "pure public relations advice" (not protected), and protecting communications that are "so intertwined" with legal advice "that they cannot be disentangled." *Lively*, 2025 WL 2606904, at *5.

Many of the documents at issue contain material wholly unrelated to the defamation claims in this case. Items 93 and 95, for example, concern press preparations for the WWE Litigation that are entirely unrelated to the Press Release or Press Conference at issue in this case. Item 94, as noted above, concerns an entirely unrelated person being investigated in connection with the WWE Litigation. Items 76 and 78 involve press inquiries about a filing in the Bill of Discovery matter that predate the Press Release by three months and bear no connection to the statements at issue.

If the Court orders any production, it should be narrowly tailored to the claims in this case. To the extent the Court finds that any privilege has been waived, Defendants respectfully submit that any such waiver extends no further than the specific factual information that was actually communicated to the public through the October 15, 2024 Press Release and Press Conference. The broader body of privileged attorney-client communications and attorney work product—

[1] In their initial Brief, defendants mistakenly noted that the WWE Litigation remained pending in Federal Court. The matter has in fact been moved to binding arbitration pursuant to an agreement between the parties, which has been made known to this Court within that matter.

including litigation strategy, mental impressions, legal theories, and confidential information conveyed by Ms. Grant that was not publicly disseminated—remains fully protected. A blanket order compelling unredacted production of all forty documents would be grossly disproportionate to the needs of this case and would inflict irreparable harm on Ms. Grant's ongoing legal interests.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court deny Plaintiffs' Motion to Compel in its entirety. In the alternative, if the Court determines that any production is warranted, Defendants request that it be strictly limited to the discrete factual information underlying the specific public statements at issue in the October 15, 2024 Press Release and Press Conference, with appropriate redactions to protect attorney work product, litigation strategy, and privileged communications that were not publicly disclosed, and subject to an appropriate protective order.

Dated: September 16, 2026

Respectfully submitted,
DEFENDANTS
ANN CALLIS
HOLLAND LAW FIRM LLC

By: *<u>/s/ Timothy Gondek / Juris #ct29190</u>*

Timothy Gondek
Hannah Meyers
LEWIS BRISBOIS BISGAARD & SMITH, LLP
185 Asylum Street, Suite 2603
Hartford, Connecticut 06103
hartfordeservice@lewisbrisbois.com
Tel: (860) 748-4806

William S. Fish, Jr.
Alexa T. Millinger
HINCKLEY ALLEN & SNYDER LLP
20 Church Street, 18th Floor
Hartford, Connecticut 06103
wfish@hinkleyallen.com
amillinger@hinkleyallen.com
Tel: (860) -725-6200
*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 16, 2026, a copy of the foregoing Defendants' Reply Brief in Opposition to Plaintiffs' Motion to Compel Complete Responses and to Overrule Defendants' Privilege and Work Product Objections was filed electronically and served via the Court's CM/ECF system upon the following counsel of record:

Alejandro Brito
Jalaine Garcia
BRITO, PLLC
2121 Ponce de Leon Boulevard, Suite 650
Coral Gables, Florida 33134

Dennis M. Durao
KARSTEN & TALLBERG, LLC
500 Enterprise Drive, Suite 4B
Rocky Hill, Connecticut 06067

*<u>/s/ Timothy Gondek / Juris #ct29190</u>*
Timothy Gondek

# Exhibit A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CARLON M. COLKER, M.D., ET AL<br>Plaintiff<br><br>v.<br><br>ANN CALLIS, ET AL<br>Defendant | CASE #: 3:25-cv-00711<br><br><br>SEPTEMBER 16, 2026 |

## AFFIDAVIT OF ANN CALLIS

I, Ann Callis, Esq., having been duly sworn, do hereby state:

1. I am over 18 years old and I understand the obligations of an oath.
2. I am a partner with the Holland Law Firm, LLC.
3. I have personal knowledge of all of the below stated facts and all are known to me as accurate and true at the time this statement is being made.
4. I have served as legal counsel to Janel Grant in multiple matters, including *Grant v. WWE, McMahon, et al.*, No. 3:24-cv-90 ("WWE Litigation"); *Grant v. Colker*, FST-CV24-6068091-S ("Bill of Discovery action"); and *Colker v. Grant*, FST-CV24-6068489-S. The matter of *Grant v. WWE* has since been moved to arbitration, which remains open and pending.
5. The WWE Litigation asserted sensitive and explosive allegations of sexual assault and trafficking against one of the most visible and powerful entertainment entities in the world.
6. The nature of this litigation ensured that it would attract a high amount of media attention.
7. Neither I nor my co-counsel had any experience related to the demands of managing high-profile and sensitive litigation within the spotlight of a potentially invasive media spotlight.

8. In examining our legal needs, I, along with my co-counsel, recognized that we would need assistance in evaluating the impact of the media and public relations upon the litigation in order to effectively represent our client and to properly move forward within the litigation itself.

9. On or about November 15, 2023, Holland Law Firm executed an agreement with The Agency PR Group LLC ("TAG") to provide litigation support in the form of public relations consulting in connection with the WWE Litigation.

10. The purpose of retaining TAG was to provide an essential litigation function which we could not perform as attorneys; to assist in addressing the legal ramifications and potential adverse effect of media coverage with respect to the litigation itself.

11. TAG's duties included preparing statements for public release, reviewing certain materials related to the litigation necessary for this function, and all of these duties were for the purpose of assisting myself and other co-counsel in rendering informed legal advice.

12. TAG's duties later expanded to the Bill of Discovery action once that matter was commenced in 2024.

13. On or about September 4, 2024, Holland Law Firm and Nelson Mullins LLP executed an agreement with SKDKnickerbocker LLC (SKDK), to provide litigation support with both the WWE Litigation and the Bill of Discovery action, replacing TAG.

14. We retained SKDK for the same reasons we had previously retained TAG; to provide an essential litigation function in connection with high-profile litigation which presented a potentially challenging media landscape posing certain dangers and risks to the litigation itself which we as attorneys were ill-equipped to handle.

15. The agreement with SKDK explicitly contemplated SKDK as being within the attorney-client privilege and work-product doctrine, as the work done by SKDK under this

engagement was to be done for and under the direction of the attorneys themselves. This expectation was held by both the parties to the agreement as well as with the client, Ms. Grant.

16. SKDK's duties included the preparation of public statements and internal documents designed to inform our litigation team about various aspects of public relations which could impact the litigation. SKDK also reviewed certain litigation materials to provide input on potential adverse effects of such materials with respect to public relations, or to provide analysis of the media landscape for use in preparation with litigation materials.

I hereby swear or sincerely affirm, as the case may be, that the foregoing is true and accurate to the best of my knowledge and belief under the pains and penalties of perjury.

a E Callis

Ann Callis, Esq.

Subscribed and sworn to before me this 16th day of September, 2026.

Dianna Rodenberg

Notary Public

DIANNA RODENBERG
Notary Public - Notary Seal
St. Louis City - State of Missouri
Commission Number 18782114
My Commission Expires Jan 26, 2027